**Charles JONES, Petitioner,**

v.

**James STINSON, Superintendent, Great Meadows Correctional Facility, Respondent.**

**No. CIV. A. 98–CV–3719(DGT).**

United States District Court, E.D. New York.

May 11, 2000.

Georgia J. Hinde, New York, NY, for Petitioner.

Richard A. Brown, District Attorney, Queens County (Nicole Beder, John M. Castellano, Robin A. Forshaw, Assistant District Attorneys, Of Counsel), Kew Gardens, NY, for Respondent.

## REVISED MEMORANDUM AND ORDER

TRAGER, District Judge.

Petitioner Charles Jones ("Jones") is currently serving an indeterminate term of imprisonment of six to twelve years pursuant to a 1995 New York state conviction for Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39 (McKinney 2000). Jones brings this action under 28 U.S.C. § 2254 (Supp.1999) seeking habeas corpus relief on the grounds that (1) certain trial court evidentiary rulings deprived him of the right to present a meaningful defense, (2) the evidence adduced at trial was insufficient to support his conviction, and (3) closure of the courtroom during the testimony of two undercover police officers abridged his right to a public trial.

## Background

### (1)

The facts of this case are simple. On March 21, 1994, at about 5:00 p.m., Jones was arrested in a Queens County "buy-and-bust" operation. An undercover police officer ("UD 53") approached Jones on a street corner, a brief conversation ensued, and Jones sold the undercover three red-capped vials containing a white powdery substance in exchange for $15 in pre-recorded bills. Shortly thereafter, a uniformed officer, Norah Finn ("Officer Finn"), arrested Jones. Officer Finn recovered the pre-recorded buy money from Jones's person, as well as three orange-capped vials, which also contained a white powdery substance. Subsequent laboratory analysis of the six vials revealed that each of the red-capped vials contained a detectable amount of cocaine, while none of the orange-capped vials contained a detectable amount of any controlled substance. On the basis of these results, Jones was charged with one count of Criminal Sale of a Controlled Substance in the Third Degree, N.Y. Penal Law § 220.39 (McKinney 2000), and was subsequently convicted after a jury trial.[1]

Jones maintained throughout the state proceedings, and now claims on this habeas petition, that he never intended to sell the undercover officer cocaine, but only did so inadvertently. According to Jones, just prior to his arrest, he had purchased six vials of crack and smoked all six at home. He then refilled the vials with baking soda and proceeded out to the street with the intention of selling them as if they contained cocaine, thereby raising money to buy more crack. Jones contends that, unbeknownst to him, three of the vials must have still contained some trace amount of crack when he refilled them with baking soda. Jones insists that he was unaware

of the residual crack present in the three vials he sold the undercover officer. Jones argues that since he did not "knowingly" sell cocaine to the undercover, he never had the intent required to be guilty of violating § 220.39.

The crux of Jones's petition, and the only one of his claims that has merit, is that a series of erroneous trial court evidentiary rulings unconstitutionally deprived him of the opportunity to present this defense to the jury.

### (2)

#### a. The Prior Arrests and Dismissals

At argument on pre-trial motions held on January 10, 1995, before the New York Supreme Court, Queens County, Jones's defense counsel represented that Jones had been arrested on three other occasions during the preceding four years for selling what appeared to be controlled substances to members of the same undercover unit that arrested him on March 21, 1994. (Transcript of Trial at 5 [hereinafter Tr.].) According to Jones and defense counsel, on each of those occasions the charges against Jones were dismissed when chemical analysis revealed that the substances he had sold contained no controlled substance. (*Id.*) Defense counsel requested that the prosecutor be required to turn over copies of any files the District Attorney had related to these arrests. (*Id.*) When the prosecutor noted that Jones's rap sheet did not reflect these three arrests, defense counsel suggested that the underlying files were sealed and therefore would not appear on Jones's rap sheet. (*Id.* at 6–7.) The court requested that defense counsel supply the prosecutor with specific details concerning the arrests to assist the prosecutor in locating the files

---

1. N.Y. Penal Law § 220.39(1) (McKinney 2000) provides that a "person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells: . . . a narcotic drug." Section 220.39(1) carries no minimum weight requirement. *See People v. Rodriguez*, 203

A.D.2d 92, 92, 610 N.Y.S.2d 217, 218 (1st Dep't 1994), *aff'd*, 85 N.Y.2d 586, 627 N.Y.S.2d 292, 650 N.E.2d 1293 (1995); *People v. Acevedo*, 192 A.D.2d 1094, 1094, 596 N.Y.S.2d 618, 619 (4th Dep't), *appeal denied*, 81 N.Y.2d 1010, 600 N.Y.S.2d 198, 616 N.E.2d 855 (1993) (Table).

and instructed the prosecutor to produce the files for inspection by the court, once they were found. (*Id.* at 7–8, 14–15.) Although the trial record does not reflect any subsequent discussion between the prosecution and defense counsel regarding the arrest files, upon inquiry by this court, the Queens County District Attorney verified that during the four years preceding the trial, Jones indeed had been arrested on at least two prior dates (viz., December 3, 1992, and June 9, 1993) for sale of narcotics and that in both cases, the charges against him were dismissed. (Letter from Assistant District Attorney Nicole Beder to Chambers of 12/7/99, at 1 [hereinafter D.A.'s Letter].) The District Attorney confirmed that in the case of the June 9, 1993 arrest (which preceded by only ten and one-half months the arrest which led to the instant conviction), the charges were dismissed because the substance(s) Jones had sold tested negative for narcotics. (*Id.*) The District Attorney further indicated that his office was in the process of determining the basis for the dismissal of charges stemming from the December 3, 1992 arrest, but the District Attorney has, to date, not been able to furnish that information to the court. (*Id.*)

**b. The Courtroom Closure Hearing**

Just prior to trial, on the morning of January 12, 1995, the trial court heard argument and testimony on a motion by the prosecution to close the courtroom during the testimony of two undercover officers, UD 53, and his "ghost," or back-up, Undercover Officer 7430 ("UO 7430"). UD 53 testified that he was still working in an undercover capacity and that he had last worked in the area of the crime, 103rd Street and Northern Boulevard, Queens, approximately one week before and might return to that very intersection as soon as the next day. (Tr. 161–62, 165.) UD 53 also stated that he had worked and would be working as an undercover in the one block radius around the courthouse. (*Id.* 162, 165.) UD 53 testified that he had several open cases in the courthouse, more

than dozen cases pending before the grand jury, and at least a dozen "lost subjects." [2] (*Id.* at 162–63.) UD 53 testified that if he appeared in open court, he would fear for his "safety and the integrity of the investigation." (*Id.* at 164.) UO 7430 offered substantially similar testimony. (*Id.* at 167–174.)

After argument from the parties and a recess, the trial court made findings of fact on the record and concluded that closure of the courtroom during the two undercover officers' testimony was justified in light of the officers' on-going undercover work in the area of the crime scene and the courthouse and in light of their concerns about their personal safety. (*Id.* at 178–82.)

**c. The Evidence**

Trial commenced with opening arguments on the afternoon of January 12, 1995. The prosecution's first witness was UD 53. After being qualified as an expert in "street level sale, packaging of controlled substances," the undercover explained the process by which crack is produced, noting that it sometimes comes in rock form but can also be "crush[ed] . . . up into powdered form." (*Id.* at 192.) The undercover then reviewed the general procedure followed by the buy-and-bust team and related the details of his transaction with Jones.

On cross-examination, defense counsel asked UD 53 whether he had ever heard the expression "beat stuff." (*Id.* at 242.) UD 53 indicated that he had and explained that "[b]eat is when somebody tries to pass off a substance that is not controlled substance to you, not a drug and they try to pass it off to you or sell it to you as if it were drugs." (*Id.*) When asked whether "there are people who do those sorts of things out on the street," the trial court sustained an unspecified objection by the prosecution. (*Id.*) Defense counsel then inquired as to what type of substance might be passed off as if it were a con-

**2.** A lost subject is a buy-and-bust suspect who has eluded apprehension. (Tr. at 163.)

trolled substance, but the trial court again sustained a general objection by the prosecutor. (*Id.* at 242–43.) Defense counsel then asked: "Isn't it a fact, that when people try to sell beat stuff they also just put the baking soda in and don't put anything else in?" (*Id.* at 243.) Despite being qualified as an expert in street level sale and packaging of controlled substances, UD 53 answered that he had "no way of knowing" because he was "not a chemist." (*Id.*) Defense counsel further inquired whether soap was sometimes used as beat stuff, and the trial court sustained another unspecified objection. UD 53 was allowed to testify, however, that he would not "be able to tell the difference if [he] looked at a vial of crack, as opposed to a vial of baking soda." (*Id.* at 244.)

Defense counsel also attempted to ask whether UD 53 was aware that Jones had been arrested on three prior dates for the sale of crack to an undercover. The prosecutor objected on the ground that the question called for hearsay because UD 53 had previously testified that he had never seen Jones prior to the incident leading to his arrest. (*Id.* at 244–48.) The objection was sustained. (*Id.* at 249.)

Thereafter, defense counsel asked how much cocaine was usually contained in a $5 vial, "if you know." (*Id.* at 264.) The prosecutor objected that the question was "beyond the realm of this witness's expertise" arguing that UD 53 was an expert in "packaging and sale, not in chemical analysis." (*Id.*) The trial judge sustained the objection. (*Id.*)

On January 13, 1995, the prosecution called its next witness, UO 7430. UO 7430 explained his role as UD 53's ghost and recounted his observations of the transaction between UD 53 and Jones. On cross-examination, defense counsel asked whether UO 7430 had ever heard the expression "beat stuff." (*Id.* at 303.) UO 7430 replied that he had and testified that beat stuff is "narcotics that is not narcotics.

Something that looks like narcotics but not narcotics." (*Id.*)[3] UO 7430 further explained that beat was "[s]omething that is not a good quality of cocaine or not cocaine at all." (*Id.* at 304.) When defense counsel asked what type of substance might be passed off as if it were cocaine, the trial court sustained yet another unspecified objection by the prosecutor. (*Id.*) Defense counsel then asked whether UO 7430 had "ever purchased anything that turned out not to be cocaine or crack, that [he] believed to be cocaine or crack." (*Id.* at 304–05.) Again, the trial court sustained the prosecutor's general objection. (*Id.* at 305.) The trial court also refused to permit UO 7430 to testify what baking soda or soap would be used for out in the street pursuant to additional unspecified objections. (*Id.*) On redirect, however, UO 7430 testified that beat could also refer to instances where there was some cocaine present, but only a "very very limited" amount. (*Id.* at 309.) On recross-examination, defense counsel was permitted to ask whether "there are people who sell—when you say 'beat stuff,' there are people who sell items that are not good quality; correct?" and whether "there are also some people who sell things that are passed off as cocaine or crack and, in fact, have nothing in it; correct?" (*Id.* at 310.) In both instances, UO 7430 answered yes. (*Id.*)

The prosecution then called Officer Finn, who described the details of Jones's arrest and the items recovered from his person, viz., the $15 of pre-recorded buy money and the three orange-capped vials. (*Id.* at 315.) Officer Finn testified that chemical analysis of the three orange-capped vials revealed no controlled substance. (*Id.* at 322.)

The prosecution next called Ali Hassan ("Hassan"), the police chemist who analyzed the contents of the three red-capped vials Jones had sold to UD 53. The trial

---

**3.** UO 7430 offered a short explanation of the origin of the expression: A prospective purchaser of narcotics who was suspicious about the quality of the drugs on offer would say, "Don't beat me. Don't beat me. Give me good stuff." (*Id.* at 304.)

court qualified Hassan as an expert in the "analysis of controlled substance [sic]." (*Id.* at 347.) Hassan testified that he separately tested the contents of each of the three vials for controlled substances. (*Id.* at 350.) On each vial's contents, he performed six different tests: Wagner's test, a general test for the presence of narcotics; the Marquis test, a test for heroin; the cobalt thiocyanate test; the stannous chloride solubility test; and two microcrystalline confirmatory tests, the platinic test and the gold chloride test. (*Id.* at 351.) These tests revealed the presence of cocaine in each of the three vials. (*Id.* at 352.)

On cross-examination, Hassan testified that the aggregate weight of the substance recovered from the three vials was exactly one grain, or 64.8 milligrams. (*Id.* at 357–58; *see also id.* at 355 (testifying that there are 15.43 grains to a gram); *id.* at 363–64 (testifying that one grain is approximately the weight of one-fifth of a tablet of aspirin).) Hassan did not, however, record the individual weight of any of the three vials or their respective contents. (*Id.* at 368–69.)

When asked whether the substance in the vials was crack, Hassan answered: "It was powder. It was cocaine hydrochloride, not crack." (*Id.* at 359.) Upon a request for further clarification on this point, Hassan testified: "It was not crack.... It was just cocaine hydrochloride salt.... It was powder." (*Id.* at 360.) Defense counsel then asked whether there was baking soda present in the vials. Hassan stated that he did not know and explained that it was not the laboratory's practice to test for the presence of noncontrolled substances. (*Id.* at 361–62.) Hassan admitted that, as a result of the limited nature of @the laboratory's test procedures, it was impossible for him to estimate what proportion of the substance sold by Jones was actually cocaine. (*Id.* at 363.) Defense counsel then attempted to elicit whether it would be "fair to say that this is not your typical sample, for instance, one grain for all three vials," but the trial court again sustained a general

objection by the prosecutor. (*Id.* at 372.) Finally, on recross-examination, Hassan stated that, even as an expert, he could not tell on visual inspection whether a white powdery substance was a form of cocaine or just baking soda. (*Id.* at 375.)

At the conclusion of Hassan's testimony, the prosecutor rested his case in chief, and defense counsel moved to dismiss the indictment for failure to prove a prima facie case. (*Id.* at 378.) The trial court denied the motion. (*Id.* at 379.)

Trial resumed on January 18, 1995. The defense's first witness was Maria Vilenskaya ("Vilenskaya"), the police chemist who tested the contents of the three orange-capped vials recovered from Jones's person during his arrest. The trial court qualified Vilenskaya as an expert in the analysis of controlled substances. (*Id.* at 390–91.) Vilenskaya testified that the aggregate weight of the powder contained in the three orange-capped vials was substantially greater than the weight of that from the three red-capped vials: 6.2 grains, or 401.8 milligrams, in total. (*Id.* at 392.) Vilenskaya testified that all three of the orange-capped vials tested negative for any controlled substance. (*Id.* at 392–93.)

The defense then called Jones to the stand. Jones testified that on March 21, 1994:

I went out and I bought six vials of crack, took them back home and I smoked them. After I finished smoking them I filled them back up with baking soda so I can go out and sell them, so I could make me some more money so I can get high all over again.

(*Id.* at 396.) Jones explained that he had dumped the contents of the vials into his crack pipe one at a time, but did not wash the vials out or clean them in any way before refilling them with baking soda. (*Id.* at 397–98.) After Jones described the transaction with the undercover officer and his arrest, defense counsel asked Jones whether he had ever sold baking soda on the street before, and Jones answered that he had. (*Id.* at 402.) But when defense counsel asked whether Jones had ever

been arrested for selling baking soda before, the trial court sustained an unspecified objection by the prosecutor. (*Id.*)

On cross-examination, the prosecutor attacked Jones's credibility by having him admit that his alleged practice of selling "beat stuff" was an attempt to deceive would-be buyers and by questioning him regarding a 1990 attempted burglary conviction. (*Id.* at 407–09.) In addition, when asked whether he understood how buy-and-bust operations work, Jones answered: "No. If I did I would never give that undercover those vials, if I knew that." (*Id.* at 408.)

At the conclusion of Jones's testimony, the defense rested. On rebuttal, the prosecution recalled Hassan to the stand. On direct, Hassan testified that he did not need to scrape the sides of the three red-capped vials in order to remove their contents. (*Id.* at 415, 416.)[4] Hassan further stated that in selecting the sample upon which to perform the tests, he emptied the contents of each of the vials onto a sheet of glascine paper and randomly picked quantities from five different places on the paper. (*Id.* at 416.)[5]

### d. Closing Arguments

In summation, defense counsel recounted Jones's story of having filled the vials with baking soda and argued that Jones did not knowingly sell cocaine to the undercover. (*Id.* 419–20, 423–24, 426–27.) The cocaine detected by the chemist was, defense counsel suggested, just a speck of crack left over from the previous contents of the vials. (*Id.* at 423, 427.) In support of this theory, defense counsel stressed Hassan's testimony that he could not tell how much of the substance in the red-capped vials was cocaine as opposed to baking soda or any other non-controlled

substance and that even an expert cannot tell just by looking whether a white powder is cocaine or baking soda. (*Id.* at 417–18, 422–23.) In addition, defense counsel noted that the other three vials recovered from Jones's person contained no controlled substances. (*Id.* at 420, 426–27.) Defense counsel urged that it would not make sense for a crack addict such as Jones to sell cocaine to get money to buy more cocaine instead of just smoking the cocaine he already had. (*Id.* at 424.)

In his summation, the prosecutor argued that the fact that only those vials Jones sold to the undercover contained cocaine could not be a coincidence:

> Defendant would have you believe that he sold these three vials that just happened to have red caps on them and held on to these other three vials that just happened to have orange caps on it [sic]. Must be a coincidence. He would have you believe, lo and behold there was a speck, a speck in each of these three vials but not in these three vials.... Does that make sense to you? If [sic] makes sense he is the unluckiest person that ever walked on the face of this earth.

(*Id.* at 429.) The prosecutor suggested instead that Jones simply had different grades of merchandise—the good stuff and the bad stuff. Of course, Jones could not put a label on the vials with the bad stuff that read "bad stuff." So, the prosecutor theorized, Jones distinguished between the two by using differently colored caps. (*Id.* at 431–33.)

The prosecutor further argued that the weight of the substance in the three red-capped vials was irrelevant: "I want you to listen very carefully to the Judge's instructions ... and you will find, from the Judge's instructions, that I don't have to

---

4. The prosecution apparently sought to raise the inference that cocaine would not adhere to the sides of the vials, and thus rebut Jones's suggestion that some residue of crack must have stuck to the sides of the vials.

5. It is not entirely clear what the prosecution felt this last fact would show, but it may have

been offered as evidence that it was improbable that the substance contained only trace amounts of cocaine; presumably, the inference would be that if there was only a stray flake of cocaine in each of the vials, it is unlikely that the chemist would have found it by random selection.

prove the weight of the cocaine sold.... The fact that there is merely a grain in there means nothing." (*Id.* at 435–36.)

### e. The Jury Charge

On the next morning, January 19, 1995, the trial judge charged the jury. In charging the jury on the elements of N.Y. Penal Law § 220.39, the trial judge, in a departure from the pattern jury instruction, *see* 3 Crim. Jury Instructions New York PL § 220.39(1) (Supp.1989), remarked: "Now you will notice that the definition I have given you makes no mention of the weight or purity of the narcotic drug sold. The law speaks of the knowing and unlawful sale of any amount of a substance, if that substance in any degree contains a narcotic drug." (*Id.* at 457.) After the instructions were given, defense counsel noted his objection to the judge's remarks on weight and purity. (*Id.* at 463–64.)

### f. Deliberations and Verdict

The jury began deliberations at 12:10 p.m. At about 4:50 p.m., the jury requested a read-back of Jones's testimony, the elements of the crime charged, and testimony regarding a subsequent promotion of UD 53. (*Id.* at 464, 466, 473.) On readback of the charge on the elements of crime, the trial judge did not repeat his additional comments regarding the weight or purity of the substance. (*Id.* at 476.)

At 7:00 p.m., the jury returned with a verdict of guilty. (*Id.* at 477–78.)

### (3)

On May 27, 1997, in a three-to-two split decision, the Appellate Division affirmed Jones's conviction on direct review. *See* *People v. Jones*, 239 A.D.2d 602, 658 N.Y.S.2d 366 (2d Dep't 1997). The majority summarily rejected Jones's claim that the evidence presented in the trial court was insufficient to prove his intent to sell cocaine. *See id.* at 603, 658 N.Y.S.2d at 367–68. Likewise, the majority found that the jury's verdict was not against the weight of the evidence. *See id.* at 603, 658 N.Y.S.2d at 368. On this latter point, the majority emphasized that the credibility of Jones's story "was seriously undercut by the testimony of the prosecution's chemist that the substance contained the three vials which the undercover officer purchased from the defendant was not crack cocaine, but cocaine in its salt form." *Id.; see also* Tr. 359–60 (chemist Hassan's testimony on point). Although the issue had not been argued at trial, the majority apparently reasoned that this testimony demonstrated that Jones's claim was chemically impossible: If the controlled substance detected in the three vials was just the residue of the crack that Jones had previously smoked, then one would expect that the chemist would have detected the presence of crack cocaine, rather than cocaine in its salt form.[6]

Notably, however, upon inquiry by this court, the District Attorney contacted the police laboratory, which advised that none of the tests routinely performed by the laboratory can, in fact, distinguish between crack and cocaine hydrochloride.[7] Although the two substances are related to one another in terms of manufacture— crack cocaine is formed as the product of a chemical reaction that occurs when cocaine hydrochloride is mixed with water and baking soda and then heated,[8] they are

---

**6.** The argument appears for the first time in the prosecution's brief on direct appeal. *See* Brief for Respondent at 15, *People v. Jones*, 239 A.D.2d 602, 658 N.Y.S.2d 366 (2d Dep't 1997) (No. 95–01401).

**7.** *See* Letter from Assistant District Attorney Nicole Beder to Chambers of 2/21/00, at 1; *see also* Tr. 51 (testimony of Hassan) (describing the Wagner test as a general test for the presence of narcotics and the Marquis test as a test for heroin); Sigma–Aldrich, Inc., *Tech-*

*nical Bulletin: Cobalt Thiocyanate Test Reagents for Cocaine and PCP* (visited April 6, 2000) <http://www.sigma.sial.com/techinfo/qtcoa.htm> (description of cobalt thiocyanate test by test kit manufacturer) (stating that the cobalt thiocyanate test yields positive results not only for both cocaine hydrochloride and crack cocaine, but for PCP as well).

**8.** *See United States v. Davis*, 864 F.Supp. 1303, 1305 (N.D.Ga.1994); *United States v.*

actually chemically distinct. Crack cocaine is a form of cocaine base, $C17H21NO4$, while the salt form of cocaine commonly used for snorting is cocaine hydrochloride, $C17H21NO4HCl$.[9] Because of the difference in their chemical compositions, the two substances have distinct chemical properties. Most notably, crack cocaine has a lower melting point than cocaine hydrochloride, making it more volatile and thus easier to smoke.[10]

The sole basis for Hassan's opinion that the substance recovered from the red-capped vials was cocaine hydrochloride appears to have been the fact that the substance was in a powder form. If this was the basis for his opinion, it was not chemically sound. Although crack cocaine is generally sold in a rock form, it can be ground into a powder like cocaine hydrochloride.[11] Consequently, the fact that a substance is in powder form is not dispositive of whether it is cocaine hydrochloride rather than crack cocaine. Moreover, if Jones's story that the vials contained baking soda with a trace amount of crack is true, the visual appearance of the substance is easily explained; judicial notice is taken of the fact that baking soda is sold in the form of a white powder. On this last point, it bears noting that Hassan admitted on recross-examination that, even as an expert, he could not tell on visual inspection whether a white powdery substance was a form of cocaine or just baking soda.[12]

In sum, then, Hassan's opinion that the substance in the three vials was definitely cocaine hydrochloride as opposed to crack cocaine does not appear to have been correct. To what extent the mistaken impression given by the chemist's testimony colored the majority's view of the entire case is impossible to discern.

At any rate, the crucial aspect of the majority opinion for the purpose of this petition was its treatment of Jones's claim that the trial court's rulings deprived him of the right to present a meaningful defense. The majority began by noting that "[a]t no time during the trial did defense counsel articulate that the trial court's rulings improperly interfered with the ability to present a defense." *Jones*, 239 A.D.2d at 603, 658 N.Y.S.2d at 368 (citing *People v. Zambrano*, 114 A.D.2d 872, 494 N.Y.S.2d 904 (2d Dep't 1985)). Nonetheless, the majority went on to discuss the merits of Jones's claim. Essentially, the majority reasoned that, despite the adverse trial court rulings, Jones was able to present enough evidence in support of his claim in order to render the trial fair. *See id.* at 603–04, 658 N.Y.S.2d at 368. Specifically, the majority cited the fact that the undercover officers testified that "beat" is street slang for an innocuous substance that someone sells as if it were a controlled substance, Jones's testimony that he had sold baking soda as cocaine on previous occasions, and the fact that the aggregate weight of the substance recovered from the three vials sold to the undercover officer weighed approximately as much as one-fifth of a tablet of aspirin. *See id.* In the majority's view, the admission of this evidence gave Jones a meaningful opportunity to present his defense. *See id.*

Two justices of the Appellate Division panel vigorously dissented. Responding to the majority's assessment of Jones's fair trial claim, the dissenting justices observed that evidence of Jones's alleged three prior

---

*Madison*, 781 F.Supp. 281, 285 (S.D.N.Y. 1992).

9. *See United States v. Canales*, 91 F.3d 363, 367 (2d Cir.1996); *Davis*, 864 F.Supp. at 1304.

10. *See Davis*, 864 F.Supp. at 1305; *Madison*, 781 F.Supp. at 283 n. 2, 285 (noting also that cocaine hydrochloride is soluble in water, while crack cocaine is not).

11. *See* Tr. 192 (testimony of UD 53) (explaining that crack cocaine can be "crush[ed] ... up into powdered form"); *Davis*, 864 F.Supp. at 1305 (same); *cf. id.* (noting that "cocaine hydrochloride can appear lumpy if it is pressed").

12. (Tr. at 375.)

arrests was relevant as "habit evidence" that showed a common scheme or plan to sell baking soda in lieu of cocaine, and, was, thus, relevant to the intent element of the crime charged. *See id.* at 604, 658 N.Y.S.2d at 369 (Friedmann, J., dissenting). The dissenters further argued that the trial court's refusal to allow UD53 and Hassan (who had each been qualified as experts on narcotics) to testify as to the quantity of cocaine typically found in a $5 vial of cocaine

> denied [the jury] the information they needed to assess whether the quantity of cocaine sold by the defendant comported with a criminal intention to sell a controlled substance, or was instead more consistent with the theory of the defense that defendant's sole intention had been to sell baking soda or fake cocaine.

*Id.* In addition, the dissent found that these errors were

> compounded by the prosecutor's arguing on summation that the minute quantity of cocaine present in the vials the defendant had sold "means nothing" with respect to his intention to sell a controlled substance, and that if *any* cocaine *at all* was present, the defendant's criminal intention could be deduced. The prosecutor urged the jury to "listen very carefully to the Judge's instructions" on this issue. Thereafter, the court charged that "the weight or purity of the narcotic drug sold" was irrelevant to an assessment of the defendant's guilt, because "[t]he law (Penal Law § 220.39[1]) speaks of the knowing and unlawful sale of *any* amount of a substance, if that substance in *any degree* contains a narcotic drug" (emphasis supplied). Defense counsel objected to this charge, which indeed effectively directed the jury to reject the defendant's defense and to return a verdict of guilty.

*Id.* at 606, 658 N.Y.S.2d at 369–70.

The dissent concluded that "the defendant was systematically thwarted in his efforts to establish that the vials recovered from him had contained only a trace residue of controlled substance, [and] his ability to develop his defense was seriously curtailed." *Id.* at 606, 658 N.Y.S.2d at 369. Moreover, in closing, the dissent strenuously objected to the majority's suggestion that Jones's fair trial claim might be unpreserved:

> Contrary to the majority's assertion, this entire cluster of issues was adequately preserved for appellate review. Throughout the trial, the defendant never desisted from his efforts to introduce evidence establishing that any drugs found in the vials he had sold to the undercover officer were no more than a trace residue accidentally left behind from the crack that he had smoked earlier. That the amount of cocaine recovered was too small to evidence an intent to sell a controlled substance was at all times the crux of the defense, and this fact was quite clear to the trial court, whose rulings and instructions "expressly decided the question raised on appeal" (CPL 470.05[1] ).

*Jones,* 239 A.D.2d at 606, 658 N.Y.S.2d at 370.

**(4)**

On July 2, 1997, Jones filed an application for leave to appeal to the New York Court of Appeals. By summary order, the application was denied on July 21, 1997. *See People v. Jones,* 90 N.Y.2d 894, 662 N.Y.S.2d 437, 685 N.E.2d 218 (1997) (Table).

**(5)**

On May 29, 1997, two days after the Appellate Division's affirmance was issued, Jones filed a motion with the trial court to set aside his sentence pursuant to N.Y. C.P.L. § 440.20 (McKinney 1994 & Supp. 1999). In his motion papers, Jones argued that the evidence adduced at trial did not demonstrate his intent to sell cocaine and that his sentence was excessive. The New York Supreme Court, Queens County, denied the motion on the ground that the "Appellate Division, Second Department has previously determined this particular

claim [sic] on its merits in the defendant's direct appeal." *People v. Jones*, Indict. No. N10706/94 (N.Y. Sup.Ct., Queens County Apr. 7, 1998) (short form order denying N.Y. C.P.L. § 440.20 motion at 2). By summary order, the Appellate Division denied Jones leave to appeal the denial of his § 440.20 motion. *See People v. Jones*, No. 98–070783 (2d Dep't Sept. 23, 1998) (denial of leave to appeal).

### (6)

On May 20, 1998, Jones filed a timely pro se petition for habeas corpus in this court. Jones interposed five claims: (1) the trial court evidentiary rulings deprived him of his right to present a defense; (2) the evidence was insufficient to support the verdict; (3) the courtroom closure was improper; (4) he received ineffective assistance of counsel; and (5) the trial judge improperly instructed the jury on the scienter requirements of Penal Law § 220.39.

On May 5, 1999, this court appointed counsel to represent Jones. Habeas counsel filed additional briefs on petitioner's behalf, arguing only the first three of petitioner's claims, in light of the fact that the last two have not been exhausted in the state courts. Through counsel, petitioner has offered to withdraw the unexhausted claims in order to avoid the partial exhaustion rule of *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (requiring that a habeas petition that includes any unexhausted claim must be dismissed in its entirety). (Pet'r's Mem. Supp. at 26.) Accordingly, the unexhausted claims will be deemed withdrawn.[13]

Respondent opposes each of the three claims now before the court on the grounds that federal habeas review is barred by adequate and independent state procedural grounds and that the claims are, at any rate, without merit.

### Discussion

### (1)

### Petitioner was deprived of the opportunity to present a meaningful defense.

**a. Review of petitioner's claim is not barred by an adequate and independent state ground.**

 Considerations of finality, federalism, and comity dictate that a federal habeas court may not review a state court decision that rests on an adequate and independent state procedural default unless the habeas petitioner can show "cause" for the default and "prejudice attributable thereto" or demonstrate that the failure to consider the federal claim will result in a "fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1042, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted); *accord Coleman v. Thompson*, 501 U.S. 722, 730–31, 750, 111 S.Ct. 2546, 2554, 2565, 115 L.Ed.2d 640 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 81, 87–90, 97 S.Ct. 2497, 2503–04, 2506–08, 53 L.Ed.2d 594 (1977). In applying this rule, "the mere fact that a federal claimant failed to abide by a state procedural rule does not, in and of itself, prevent [a federal court] from reaching the federal claim: '[T]he state court must actually have relied on the procedural bar as an independent basis for its disposition of the case.'" *Harris*, 489 U.S. at 261–62, 109 S.Ct. at 1042 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 328, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231

---

**13.** Petitioner would also appear to have an unexhausted, but meritorious *Brady* claim based on the prosecutor's failure to turn over his arrest records—arrest records which the District Attorney readily located upon this court's request. (D.A.'s Letter, *supra*, at 1.) Following discussion of the issue at oral argument, petitioner's counsel offered to exhaust the *Brady* claim and amend the petition to include the *Brady* claim. (Letter from Peti-

tioner's Counsel to Chambers of 1/28/00, at 3.) However, in light of the fact that petitioner has already served six years of his sentence and this court's conclusion that habeas relief should be granted on his claim that he was unconstitutionally prevented from presenting his defense, *see infra* § 1(b)(iii)(C), exhaustion of the *Brady* claim at this point would unnecessarily delay the disposition of the petition.

(1985)); *see also Ylst v. Nunnemaker,* 501 U.S. 797, 801, 111 S.Ct. 2590, 2593, 115 L.Ed.2d 706 (1991) ("State procedural bars are not immortal, however; they may expire because of later actions by state courts. If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review that might have otherwise been available." (citing *Harris,* 489 U.S. at 262, 109 S.Ct. at 1043)); *Michigan v. Long,* 463 U.S. 1032, 1038 n. 4, 103 S.Ct. 3469, 3475 n. 4, 77 L.Ed.2d 1201 (1983) ("We may review a state case decided on a federal ground even if it is *clear* that there was an available state ground for decision on which the state court could have properly relied." (citing *Beecher v. Alabama,* 389 U.S. 35, 37 n. 3, 88 S.Ct. 189, 190 n. 3, 19 L.Ed.2d 35 (1967)) (emphasis added)); *cf. Caldwell,* 472 U.S. at 327, 105 S.Ct. at 2638 ("The mere existence of a basis for a state procedural bar does not deprive this Court of jurisdiction; the state court must actually have relied on the procedural bar as an independent basis for its disposition of the case." (citing *County Court of Ulster County v. Allen,* 442 U.S. 140, 152–54, 99 S.Ct. 2213, 2222–23, 60 L.Ed.2d 777 (1979))).

■ As the Supreme Court has noted, *see, e.g., Coleman,* 501 U.S. at 732, 111 S.Ct. at 2555, the determination of whether a state decision actually rested on state rather than federal grounds is often complicated by the fact the state court opinion may discuss both state procedural defects in a defendant's federal claim as well as the merits of the claim. To resolve the ambiguity created by such mixed opinions, a federal habeas court must apply the "plain statement" rule originally developed in the context of determining the Supreme Court's jurisdiction over direct appeals under 28 U.S.C. § 1257 (1993):

> In habeas, if [1] the decision of the last state court to which the petitioner presented his federal claims fairly appeared to rest primarily on resolution of those claims, or to be interwoven with those claims and [2] did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the petition.

*Coleman,* 501 U.S. at 735, 111 S.Ct. at 2557; *cf. Long,* 463 U.S. at 1042, 103 S.Ct. at 3477 (holding that, on direct review, if "it fairly appears that the state court rested its decision primarily on federal law," the Supreme Court may reach the federal question on review unless the state court's opinion contains a " 'plain statement' that [its] decision rests upon adequate and independent state grounds"). Where a state court decision does fairly appear to rest primarily on federal law and a plain statement to the contrary is lacking, a federal court "will accept as the most reasonable explanation that the state court decided the case the way it did because it believed that federal law required it to do so." *Long,* 463 U.S. at 1041, 103 S.Ct. at 3476.[14]

Thus:

> case." *Harris,* 489 U.S. at 261–262, 109 S.Ct. at 1042; *see Hayes v. Coombe,* 142 F.3d 517, 518 (2d Cir.1998) (per curiam) (holding that the independent ground "must be *relied upon* clearly and unambiguously in the state court's opinion" (emphasis added)). The source of the "explicitly invoked" language appears to be a footnote in the *Harris* opinion, *see Garcia,* 188 F.3d at 77 (citing *Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10); *Glenn,* 98 F.3d at 724 (same), which expressly qualifies that the state procedural ground must be "explicitly invoke[d] ... *as a separate basis for decision." Harris,* 489 U.S. at 264 n. 10, 109 S.Ct. at 1044 n. 10 (emphasis added); *see Velasquez v. Leonardo,* 898 F.2d 7, 9 (2d Cir. 1990) (acknowledging qualification).

---

**14.** On occasion, the Second Circuit has paraphrased the test of *Long* and *Harris* as simply being whether state law grounds were "explicitly invoked." *See, e.g., Garcia v. Lewis,* 188 F.3d 71, 77 (2d Cir.1999) ("explicit invocation"); *Glenn v. Bartlett,* 98 F.3d 721, 725 (2d Cir.1996) ("clearly invoked"). This formulation is somewhat unfortunate, in that it suggests that the plain statement rule is satisfied whenever state law is mentioned in the state opinion. That is not the standard; state law must not only be explicitly invoked, it must be applied to render a decision. What *Long* and *Harris* require is a clear and express statement that the state court decision "actually ... relied on the procedural bar as an independent basis for its disposition of the

After *Long*, a state court that wishes to look to federal law for guidance or as an alternative holding while still relying on an independent and adequate state ground can avoid the presumption by stating "clearly and expressly that [its decision] is ... based on bona fide separate, adequate, and independent grounds." *Coleman*, 501 U.S. at 733, 111 S.Ct. at 2556 (quoting *Long*, 463 U.S. at 1041, 103 S.Ct. at 3476).[15]

■■ In this case, the last state court to be presented with petitioner's claims was the New York Court of Appeals, which denied his appeal with a summary order that gave no indication of the grounds for its decision. *See People v. Jones*, 90 N.Y.2d 894, 662 N.Y.S.2d 437, 685 N.E.2d 218 (1997) (Table). For the purpose of applying the *Long/Harris* rule, one must therefore "look through" this silent denial and apply the rule to the decision of the last court to issue a reasoned opinion on petitioner's claim—here, the Appellate Division. *See Ylst*, 501 U.S. at 803, 111 S.Ct. at 2594 (establishing presumption that "[w]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground").[16]

In applying the *Long/Harris* rule to the instant Appellate Division decision, the Supreme Court's own application of the rule in *Harris* is particularly instructive. In *Harris*, the defendant raised an ineffective assistance of counsel claim in a state court petition for post-conviction relief that he had not raised on his direct appeal in the state courts. In its order rejecting this claim, an Illinois appellate court referred to "the 'well-settled' principle of Illinois law that 'those [issues] which could have been presented [on direct appeal], but were not, are considered waived.'" *Harris*, 489 U.S. at 258, 109 S.Ct. at 1040 (quoting Illinois appellate court's unpublished order). Although the state court expressly found the ineffective assistance claim could have been raised on direct appeal, it nevertheless "went on to consider and reject petitioner's ineffective-assistance claim on its merits." *Id.* In the absence of "'an explicit finding of waiver [or] an expression of an intention to ignore waiver,'" *Harris*, 489 U.S. at 259, 109 S.Ct. at 1041 (quoting *Harris v. Reed*, 822 F.2d 684, 687 (7th Cir.1987)), the Supreme Court agreed with the district court that the "state court 'did not appear to make two rulings in the alternative, but rather to note a procedural default and then ignore it, reaching the merits instead,'" *id.* (quot-

15. To the extent that the Second Circuit once suggested that "*Coleman* cast a negative light on much of *Harris v. Reed*," *Epps v. Commissioner of Correctional Servs.*, 13 F.3d 615, 618 n. 2 (2d Cir.1994), that suggestion appears erroneous in light of the Supreme Court's decision in *Arizona v. Evans*, 514 U.S. 1, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). There, the Supreme Court reaffirmed the vitality of the *Long/Harris* presumption by applying the test and noting that "since *Long*, we repeatedly have followed [its] 'plain statement' requirement." *Evans*, 514 U.S. at 7 n. 2, 115 S.Ct. at 1189 n. 2; *see also id.* at 8, 115 S.Ct. at 1190 ("We believe that *Michigan v. Long* properly serves its purpose and should not be disturbed."). As a careful reading of *Coleman* reveals, *Coleman* did not reduce the scope of the *Long/Harris* presumption. Rather, it rejected the *Coleman* petitioner's invitation to *extend* the rule: In *Coleman*, the petitioner had argued that in *all* cases where a habeas petitioner has presented federal claims to the state court, the state court decision should always be presumed to rest on federal grounds absent a plain statement to the contrary, even if the state decision under collateral attack did *not* fairly appear to rest primarily on federal law or be interwoven with federal law. *See Coleman*, 501 U.S. at 735–40, 111 S.Ct. at 2557–59.

16. The presumption that subsequent unexplained orders rest on the same grounds as the last reasoned judgment on the claim is rebuttable, but only on "strong evidence," such as evidence that a retroactive change in the law precluded the subsequent court from relying on the same ground or evidence that the appeal from the lower court was "plainly out of time." *Ylst*, 501 U.S. at 804, 111 S.Ct. at 2595. Respondent has not offered any evidence to rebut the *Ylst* presumption, nor is any apparent. The *Long/Harris* rule will, therefore, be applied to the Appellate Division decision.

ing *U.S. ex rel. Harris v. Reed,* 608 F.Supp. 1369, 1378 (N.D.Ill.1985)). The Supreme Court expressly rejected the Seventh Circuit's prior holding in the case that the state court's references to Illinois law were sufficient to find an adequate and independent state procedural bar:

> Applying the "plain statement" requirement in this case, we conclude that the Illinois Appellate Court did not "clearly and expressly" rely on waiver as a ground for rejecting any aspect of petitioner's ineffective-assistance-of-counsel claim. *To be sure, the state court perhaps laid the foundation for such a holding by stating that most of petitioner's allegations "could have been raised [on] direct appeal." Nonetheless, ...,* *this statement falls short of an explicit reliance on a state-law ground.* Accordingly, this reference to state law would not have precluded our addressing petitioner's claim had it arisen on direct review.... [I]t also does not preclude habeas review by the District Court.

*Harris,* 489 U.S. at 266, 109 S.Ct. at 1045 (citations omitted) (emphasis added).

 The Appellate Division's treatment of Jones's fair trial claim parallels *Harris* exactly. Although the Appellate Division's comment that "[a]t no time during trial did defense counsel articulate that the trial court's rulings improperly interfered with the ability to present a defense," *Jones,* 239 A.D.2d at 603, 658 N.Y.S.2d at 368, and its citation to *People v. Zambrano,* 114 A.D.2d 872, 494 N.Y.S.2d 904 (2d Dep't 1985) (holding that where defense counsel failed to make specific offer of proof as to the admissibility of testimony after the prosecutor's objection thereto, the issue could not be raised for the first time on appeal), certainly "laid the foundation," *Harris,* 489 U.S. at 266, 109 S.Ct. at 1045, for a finding that Jones had waived his fair trial claim, the Appellate Division did not go on to hold that Jones's claim was "unpreserved for appellate review." [17] Instead, the Appellate Division went on to review the merits of the claim at length, concluding that "the defendant was allowed to present his defense, and the trial court's rulings did not deny defendant a fair trial." *Jones,* 239 A.D.2d at 604, 658 N.Y.S.2d at 368. Thus, like the state appellate court in *Harris,* the Appellate Division "did not appear to make two rulings in the alternative, but rather to note a procedural default and then ignore it, reaching the merits instead." *Harris,* 489 U.S. at 258, 109 S.Ct. at 1040. Accordingly, precisely as in *Harris,* the Appellate Division's passing reference to state law "falls short of an explicit reliance on a

**17.** This is something that the Appellate Division knows how to do. On the same day that *Jones* was decided, the Appellate Division expressly stated in each of the following cases that particular claims were "unpreserved for appellate review." *People v. Garcia,* 239 A.D.2d 599, 600, 658 N.Y.S.2d 365, 366 (2d Dep't 1997); *People v. Person,* 239 A.D.2d 612, 613, 658 N.Y.S.2d 372, 373 (2d Dep't 1997); *People v. Mojica,* 239 A.D.2d 609, 609, 658 N.Y.S.2d 977, 978 (2d Dep't 1997); *People v. Norwood,* 239 A.D.2d 610, 611, 658 N.Y.S.2d 978, 978 (2d Dep't 1997); *People v. Vega,* 239 A.D.2d 615, 615–16, 658 N.Y.S.2d 988, 989 (2d Dep't 1997); *People v. Bell,* 239 A.D.2d 593, 593, 658 N.Y.S.2d 992, 992 (2d Dep't 1997); *People v. Chu–Joi,* 239 A.D.2d 596, 597, 658 N.Y.S.2d 976, 976 (2d Dep't 1997); *People v. Ortiz,* 239 A.D.2d 611, 611, 658 N.Y.S.2d 997, 998 (2d Dep't 1997); *People v. Stewart,* 239 A.D.2d 614, 614, 658 N.Y.S.2d 998, 998 (2d Dep't 1997); *People v. Anglin,* 239 A.D.2d 592, 593, 658 N.Y.S.2d 994, 994 (2d Dep't 1997); *People v. Black,* 239 A.D.2d 593, 594, 658 N.Y.S.2d 994, 995 (2d Dep't 1997); *People v. Crouch,* 239 A.D.2d 597, 597, 658 N.Y.S.2d 979, 979 (2d Dep't 1997). The *Jones* majority's failure to actually hold that Jones's fair trial claim was unpreserved for appellate review would appear to be a concession to the dissenters, who concluded that Jones's claim was preserved. *See Jones,* 239 A.D.2d at 606, 658 N.Y.S.2d at 370 (Friedman, J., dissenting). Unlike the dissenters, however, the majority did not find that the claim had merit, as indicated by its discussion of the issue, and, therefore, decided the claim on the merits accordingly. *See id.* at 604, 658 N.Y.S.2d at 368 (holding that "the defendant was allowed to present his defense, and the trial court's rulings did not deny defendant a fair trial").

state-law ground," *Harris,* 489 U.S. at 266, 109 S.Ct. at 1045.

In contrast, Jones's case is clearly distinguishable from decisions in which the Second Circuit has found a state decision to rest on adequate and independent grounds despite discussion of the merits of a petitioner's federal claims. For instance, the Second Circuit held the Appellate Division's reliance on an adequate and independent state procedural default clearly expressed where the Appellate Division actually stated that a defendant's courtroom closure claim was "unpreserved for appellate review" but then went on to discuss the merits of the claim in the remainder of the same paragraph. *See Garcia,* 188 F.3d at 77 (reviewing *People v. Garcia,* 239 A.D.2d 599, 600, 658 N.Y.S.2d 365, 366 (2d Dep't 1997)). Likewise, in *Glenn,* 98 F.3d at 724, the Second Circuit held that an alternative holding on the merits did not lift the procedural bar to habeas review of an unpreserved evidentiary objection, where the Appellate Division both noted the defendant's failure to make a contem-poraneous objection—thus laying the factual predicate for a procedural default—and, unlike Jones's case, went on to actually conclude that defendant " 'has not preserved for review his present argument.' " *Id.* at 724 (quoting *People v. Glenn,* 185 A.D.2d 84, 90, 592 N.Y.S.2d 175, 175 (4th Dep't 1992)).[18] *Accord Velasquez,* 898 F.2d at 9 (clear and express statement found where Appellate Division actually stated that the "issue [was] not preserved for appellate review" before discussing alternative holding on the merits (reviewing *People v. Velasquez,* 141 A.D.2d 882, 883, 530 N.Y.S.2d 208, 208 (2d Dep't 1988))).

In sum, because the Appellate Division decision fairly appears to rest primarily on the merits of Jones's federal claim, and that court failed to clearly and expressly state that its decision actually relied on Jones's state procedural default, it will be presumed that the decision did not rest on an adequate and independent state ground. A review of the merits of the claim is therefore proper.

---

**18.** This court is mindful of the Second Circuit's admonition in *Glenn* that "to require a state court to use specific talismanic phrases when ruling in the alternative would be undue formalism." *Glenn,* 98 F.3d at 725. The present holding does not run afoul of this principle, which must be understood in the context of the case in which it was announced. In *Glenn,* the petitioner argued that a state court that discussed the merits of his claim after holding that the claim was unpreserved did not truly rule in the alternative because the state court did not preface its discussion of the merits with the phrases "in any event" or "in any case." *See id.* at 724–25. Requiring such niceties of phrasing is an entirely different matter than requiring that a state court clearly and expressly state that the procedural default is a ground for the decision by actually stating that the claim is "unpreserved," "defaulted," "barred," or other words to that effect. It is not unduly formalistic to require that a state court do more than simply note a factual predicate for a holding that the claim was procedurally defaulted. *See Harris,* 489 U.S. at 266, 109 S.Ct. at 1045. Otherwise, little would be left of the plain statement rule. Because the Supreme Court has repeatedly made clear that the mere invocation of state law is not by itself sufficient to clearly express an adequate and independent state ground, *see, e.g., Evans,* 514 U.S. at 7, 115 S.Ct. at 1189 (reference to Arizona good-faith statute insufficient); *Caldwell,* 472 U.S. at 327–28, 105 S.Ct. at 2639 (reference to state rule that errors not initially assigned on appeal from trial court may not be raised before state supreme court insufficient); *California v. Carney,* 471 U.S. 386, 389 n. 1, 105 S.Ct. 2066, 2068 n. 1, 85 L.Ed.2d 406 (1985) (references to state constitution and state case law insufficient); *Long,* 463 U.S. at 1037 n. 3, 103 S.Ct. at 3474 n. 3 (statement by Michigan Supreme Court that "We hold ... that the ... search ... was proscribed by ... art. 1, § 11 of the Michigan Constitution" insufficient); *Oliver v. United States,* 466 U.S. 170, 175 n. 5, 104 S.Ct. 1735, 1739 n. 5, 80 L.Ed.2d 214 (1984) (references to state case law insufficient), an interpretation of the plain statement rule under which it could be satisfied with passing mention of state law that is available, but not actually relied upon, as a ground of decision squarely contradicts numerous Supreme Court precedents and must be rejected. So, too, must any interpretation of *Glenn 's* "talismanic language" holding that suggests that any mention of state law, no matter how brief or ambiguous, is sufficient to bar federal habeas review.

**b. An erroneous trial court evidentiary ruling prevented petitioner from presenting his defense in violation of the Constitution.**

**i. Applicable Law**

■ "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690, 106 S.Ct. 2142, 2146–47, 90 L.Ed.2d 636 (1986) (citations omitted) (internal quotations omitted). A defendant's right to present a defense includes the right to testify on his own behalf, *see Rock v. Arkansas*, 483 U.S. 44, 51–53, 107 S.Ct. 2704, 2708–10, 97 L.Ed.2d 37 (1987) (locating the right, in part, in the Fifth Amendment's Self Incrimination Clause); *Crane*, 476 U.S. at 690, 106 S.Ct. at 2146–47, as well as the right to cross-examine prosecution witnesses, *see Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973).

■ Erroneous trial court evidentiary rulings that limit a defendant's ability to testify on his own behalf or cross-examine prosecution witnesses do not, however, automatically rise to the level of constitutional error sufficient to warrant habeas corpus relief. *See Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir.1988); *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir.1983). Erroneous exclusion of testimony qualifies as constitutional error only if the omission deprived petitioner of a fundamentally fair trial. *See Rosario*, 839 F.2d at 924; *Taylor*, 708 F.2d at 891. The test for determining whether erroneous evidentiary rulings denied the defendant a fair trial is whether the excluded testimony could have " 'create[d] a reasonable doubt that did not otherwise exist.' " *Taylor*, 708 F.2d at 891 (quoting the materiality standard defined in *United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401—02, 49 L.Ed.2d 342 (1976)); *accord Justice v. Hoke*, 90 F.3d 43, 47 (2d Cir.1996); *Blissett v. Lefevre*, 924 F.2d 434, 439 (2d Cir. 1991); *Rosario*, 839 F.2d at 925.[19] In

19. Contrary to petitioner's assumption, (*see* Pet'r's Mem. Supp. at 39–40), the issue of whether the evidentiary errors were of constitutional magnitude is not governed by the test stated in *Rock v. Arkansas*. In *Rock*, the Supreme Court addressed whether a state evidentiary rule that excluded all hypnotically refreshed testimony deprived the defendant of her right to testify, holding:

> [T]he right to present relevant testimony is not without limitation. The right may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. But restrictions of a defendant's right to testify may not be arbitrary or disproportionate to the purposes they are designed to serve.

*Rock*, 483 U.S. at 55–56, 107 S.Ct. at 2711 (citation omitted) (footnote omitted) (internal quotations omitted). In *Rock*, there was no question that the state evidentiary rule was, according to its own terms, correctly applied; rather, the issue was whether the rule, when correctly applied as a matter of state law, infringed on the defendant's constitutional right to testify in her own defense. Thus, read in context, the *Rock* test is intended to cover cases where an evidentiary rule was correctly applied as a matter of state law, but

is either unconstitutional on its face or violates a constitutional right as applied. *See, e.g., Michigan v. Lucas*, 500 U.S. 145, 111 S.Ct. 1743, 114 L.Ed.2d 205 (1991) (holding that in circumstances of case the effect of state rape shield statute that required a rape defendant to file, within 10 days after arraignment, written notice of any evidence of his past sexual conduct with the victim to be filed was "arbitrary and disproportionate" to state's legitimate interest in preventing surprise, harassment and undue delay).

In this case, petitioner has taken no exception to any of the underlying evidentiary rules on which respondent argues the trial court might have been relying, e.g., relevance or cross-examination beyond the scope of direct. Rather, the claim is that, as a matter of state evidentiary law, these rulings were incorrect and that the cumulative effect of these state law errors was to deprive petitioner of a meaningful opportunity to present his defense. As such, these rulings are properly analyzed under the *Agurs* materiality standard as set forth in *Taylor* and its progeny. *See Rosario*, 839 F.2d at 923 & n. 3 (applying *Agurs* test upon finding that state trial court had erred in not finding witness unavailable under N.Y. C.P.L. § 670.10 (McKinney

making his determination:

> [T]he omission must be evaluated in the context of the entire record. If there is a reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create reasonable doubt.

*Agurs,* 427 U.S. at 112–13, 96 S.Ct. at 2401–02, *quoted in Rosario,* 839 F.2d at 925.

▇▇▇ However, not all errors of constitutional magnitude warrant habeas corpus relief. *See, e.g., Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 1714, 123 L.Ed.2d 353 (1993) (finding constitutional trial error but denying habeas relief); *Henry v. Speckard,* 22 F.3d 1209, 1215–16 (2d Cir.1994) (same). The Supreme Court has divided constitutional errors into two broad categories: structural errors (e.g., an interested judge or total absence of defense counsel), which per se require reversal, and trial errors, which are subject to harmless error review. *See California v. Roy,* 519 U.S. 2, 4–6, 117 S.Ct. 337, 338–39, 136 L.Ed.2d 266 (1996) (per curiam); *Brecht,* 507 U.S. at 629–30, 113 S.Ct. at 1717; *Arizona v. Fulminante,* 499 U.S. 279, 307–10, 111 S.Ct. 1246, 1263–65, 113 L.Ed.2d 302 (1991). Erroneous exclusion of evidence falls under the latter category. *See Crane,* 476 U.S. at 691, 106 S.Ct. at 2147 (holding that erroneous exclusion of defendant's testimony should be reviewed under harmless error standard); *Henry,* 22 F.3d at 1215–16 (trial court preclusion of certain questions on cross-examination reviewed under harmless error standard).

▇▇▇ In *Brecht,* the Supreme Court held that on collateral review of a state court judgment, the appropriate harmless error standard to apply to trial errors is whether the error had " 'a substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht,* 507 U.S. at 638, 113 S.Ct. at 1722 (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)); *accord Agard v. Portuondo,* 117 F.3d 696, 714 (2d Cir.1997), *rev'd on other grounds,* —— U.S. ——, 120 S.Ct. 1119, 146 L.Ed.2d 47 (2000).[20] An error may be found to have had such an effect even if, absent the error, the evidence was sufficient to support the conviction. *See Moore v. United States,* 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976); *Henry,* 22 F.3d at 1215. Relevant factors in determining whether the erroneous exclusion of testimony was harmless include the importance of the witness's testimony, whether that testimony was cumulative, and the strength of the evidence against the defendant. *Cf. Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986) (reciting factors relevant to the harmlessness of Confrontation Clause error); *Henry,* 22 F.3d at 1215–16 (same). Upon weighing these factors, if "a habeas court is in grave doubt as to the harmlessness of an error that affects substantial rights, it should grant relief." *O'Neal v. McAninch,* 513 U.S. 432, 445, 115 S.Ct. 992, 999, 130 L.Ed.2d 947 (1995); *accord Wray v. Johnson,* 202 F.3d 515, 525–26 (2d Cir.2000); *Peck v. United States,* 106 F.3d 450, 454 (2d Cir.1997).

Upon review of these principles, the question naturally arises whether a harmless error analysis is necessary in cases where the determination that a trial error was of constitutional magnitude relies on a finding that the error consisted of the exclusion of testimony or evidence that could have created a reasonable doubt that did

---

1984)); *Taylor,* 708 F.2d at 890–91 (applying *Agurs* test after holding that state trial court erred in its application of N.Y. C.P.L.R. provision on attorney-client privilege because confidentiality of the evidence had already been destroyed by a previous publication).

**20.** In contrast, on direct review, state courts apply the less deferential harmless error standard established by *Chapman v. California,* viz., whether the trial error was "harmless beyond a reasonable doubt." 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

not otherwise exist. Exclusion of evidence that could have created a reasonable doubt that did not otherwise exist would appear by definition to be an error that would have a substantial and injurious effect or influence on the jury's verdict. *See Dey v. Scully*, 952 F.Supp. 957, 974–76 (E.D.N.Y. 1997).

Although the Second Circuit has not explicitly addressed this issue, Supreme Court decisions that discuss the relationship between the *Agurs* materiality standard and the *Brecht/Kotteakos* harmless error standard confirm that a finding that erroneously excluded evidence was material under *Agurs* (i.e., a finding that the evidence could have created a reasonable doubt that did not otherwise exist) renders further harmless error analysis superfluous. In *Agurs* itself, the Supreme Court explicitly rejected the *Kotteakos* standard as the proper test for determining whether undisclosed exculpatory evidence was material, noting that "[u]nless every nondisclosure is regarded as automatic error, the constitutional standard of materiality must impose a higher burden on the defendant." *Agurs*, 427 U.S. at 112, 96 S.Ct. at 2401. More recently, in *Kyles v. Whitley*, the Court reaffirmed this understanding of the relationship between the *Agurs* and *Kotteakos* standards. 514 U.S. 419, 436, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995) (explaining that *"Agurs* ... opted for its formulation of materiality ... only after expressly noting that this standard would recognize reversible constitutional error only when the harm to the defendant was greater than the harm sufficient for reversal under *Kotteakos."*). Accordingly, a finding of constitutional error based on a determination of materiality under *Agurs* necessarily subsumes a harmless error determination under the *Brecht/Kotteakos* standard and, therefore, obviates the need for a separate harmless error analysis. *See Dey*, 952 F.Supp. at 974–76; *see also Kyles*, 514 U.S. at 436, 115 S.Ct. at 1567

(holding that "once a reviewing court applying [*United States v.* ]*Bagley* [, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (refining the *Agurs* materiality standard for *Brady* violations) ] has found constitutional error there is no need for further harmless-error review").[21]

■ In sum, then, the trial court's evidentiary rulings interfered with Jones's right to present a meaningful defense to a degree sufficient to warrant habeas corpus relief if, and only if, the excluded testimony could have created a reasonable doubt as to his guilt that otherwise did not exist.

### ii. Standard of Review

■ Under 28 U.S.C. § 2254(d) (Supp.1999), as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), a federal court may not grant an application for a writ of habeas corpus by a person in custody pursuant to a state court judgment

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* A state court decision is "contrary to" clearly established law within the meaning of § 2254(d)(1) if (1) "the state court applies a rule that contradicts the governing law set forth" in the relevant Supreme Court precedents, or (2) "the state court confronts a set of facts that are materially

---

**21.** The Second Circuit appears to have tacitly recognized this principle in several excluded evidence cases. *See, e.g., Justice,* 90 F.3d at 50 (granting habeas relief after finding that excluded evidence could have created a reasonable doubt that did not otherwise exist but without conducting harmless error analysis); *Rosario,* 839 F.2d at 927 (same).

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Supreme Court] precedent." *Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000). A state court decision involves an "unreasonable application of" clearly established federal law if the state court's application of Supreme Court precedent to the facts of the case is "objectively unreasonable." *Id.* at ——, 120 S.Ct. at 1522 (rejecting subjective reading of the unreasonable application prong of § 2254(d)(1) that would require a determination of whether the state court applied federal law "in a manner that all reasonable jurists would agree was unreasonable"). For the purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." *Id.* at ——, 120 S.Ct. at 1522. Thus, "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

### iii. The Appellate Division's decision involved an unreasonable application of clearly established federal law.

Jones cites three of the trial court's evidentiary rulings in support of the claim that he was denied a meaningful opportunity to present his defense:

(A) UD 53, who was qualified as an expert in the street level sale and packaging of controlled substances, was not permitted to answer the defense question "In a Five-Dollar vial how many grains are usually in a vial, if you know?" on the ground that it was beyond the scope of his expertise, (Tr. 264);

(B) the chemist Hassan, who was qualified as an expert in the chemical analysis of controlled substances, was not permitted to answer the question "Would it be fair to say that this is not your typical sample, for instance, one grain for all three vials?" on the basis of a general objection, (*id.* at 372); and

(C) Jones was not permitted to answer the question "Have you ever been arrested before with respect to items that were baking soda, turned out to be baking soda?" on the basis of a general objection, (*id.* at 402).

Although, as explained below, only the last of these questions was actually relevant to Jones's defense, each question will be analyzed separately.[22]

### A. Preclusion of UD 53's answer was not reversible error under New York Law; nor was it constitutional error.

 What possible rationale there could have been for sustaining a beyond-the-scope-of-expertise objection to the question regarding the typical amount of cocaine in a $5 vial is altogether obscure. UD 53 had been qualified as an expert in the street level sale and packaging of narcotics. (Tr. 192.) UD 53 had also previously testified that he had been given specialized training in the street level sale of narcotics and had participated in over 300 buys as an undercover. (*Id.* at 191.) In addition, UD 53 testified as to the chemical process by which crack is made. (*Id.* at 192.) On these facts, the trial judge's acceptance of the prosecutor's argument that the question was "beyond the realm of this witness's expertise" and required expertise in "chemical analysis" was clear error. The going rate for a given amount of narcotics was presumably at the very core of UD 53's expertise; the prosecutor's suggestion that after 300 buys, UD 53 would not know how much cocaine to expect in a $5 vial is untenable.

 Under New York evidentiary law, if testimony is excluded pursuant to a specific objection, as was the case here, then a reviewing court may uphold the ruling in two circumstances: (1) if the

---

22. If more than one of the questions had been relevant, the analysis below would have pro-

ceeded in terms of their cumulative effect on the verdict.

specific objection was correctly sustained, or (2) if " 'the evidence excluded was in no aspect of the case competent, or could not be made so.' " *Bloodgood v. Lynch,* 293 N.Y. 308, 312, 56 N.E.2d 718, 719 (1944) (quoting *Tooley v. Bacon,* 70 N.Y. 34, 37 (1877)). Although the trial court's ruling was clearly erroneous in response to the specific objection made by the prosecutor (beyond-the-scope-of-the-witness's-expertise), the exclusion was not reversible error under New York law because the question was irrelevant to Jones's defense, and, hence, "in no aspect of the case competent." *Id.*

Jones's defense was that he did not intend to sell cocaine to UD 53 and that the cocaine detected in the three red-capped vials was just residue from the vials' previous use. As such, a comparison of the *purity* of the substance recovered from the three red-capped vials with the average purity of street level cocaine in the area would be relevant. For instance, if the cocaine sold on the street typically had a purity of seventy percent (plus or minus ten percent), then proof that the purity of Jones's cocaine was, say, less than five percent would clearly corroborate his claim that the controlled substance the chemist detected was just a lingering trace amount and, thus, would tend to show that he did not have the requisite intent to sell cocaine.[23]

By way of contrast, testimony that a typical $5 vial contains substantially more white powdery substance than did Jones's vials would not make his defense any more or less probable than it was without the testimony. As long as the substance in the vials was not substantially more diluted than average, the fact that the weight of the substance in the vials was less than average would be totally consistent with the charge that Jones intended to sell cocaine; the observation would, at most, show that Jones charged too much for the amount that he sold. Thus, the relative weight of the contents of Jones's vials and a typical $5 vial of cocaine is by itself irrelevant to Jones's defense.[24]

Because the trial court's ruling with respect to UD 53 was not a reversible error as a matter of state evidentiary law, there is no need to reach the *Agurs* analysis. Of course, if evidence is irrelevant, i.e., does

---

**23.** No evidence was adduced at trial as to the purity of the substance taken from the three red-capped vials. The chemist who tested them, Hassan, stated that he did not know how much of the sample was cocaine and how much was baking soda or other non-controlled substances. (Tr. 361–63.) Hassan explained that once a controlled substance is detected in a sample, the laboratory does not generally perform further tests to determine the purity of the drug. (*Id.*)

**24.** To be absolutely clear on this point, it must be emphasized that the chemist Hassan did not testify that he recovered a certain amount of white powdery substance from the three red-capped vials and that from that substance he extracted one grain of pure cocaine. Rather, Hassan testified that the aggregate weight of the contents of all three vials, i.e., all of the white powdery substance in each of the three vials taken together, was one grain. (*Id.* at 354–58, 361–63.) Defense counsel grasped this fact, (*see id.* at 418 (defense summation)), and, in this context, his question "Would it be fair to say that this is not your typical sample, for instance, one grain for all three vials?" was clearly meant to elicit a

statement as to the overall amount of white powdery substance typically found in a $5 vial of cocaine.

Even if the question were not so construed, the answer would still be irrelevant to Jones's defense. Suppose that the chemist had answered that three $5 vials of cocaine typically contain two grains of pure cocaine, in addition to some amount of cutting agent, such as baking soda. The fact that the total weight of white powdery substance in Jones's vials was only one grain would not make Jones's story any more (or less) probable than it was without the testimony. For if that one grain of white powdery substance was pure cocaine, all that would have been shown is that Jones intended to short-change his would-be customers, i.e., it would have been consistent with an intent to sell cocaine at an above-market price. However, Jones's defense would gain nothing by showing that he intended to cheat UD 53 by selling UD 53 a less-than-average amount of cocaine for the money; Jones had to show that he intended to cheat UD 53 by selling UD 53 something that Jones did not believe was cocaine at all. That latter, relevant showing required evidence as to purity, not weight.

not make a claim or defense any more or less probable $_v$than it would otherwise be, see *People v. Wilder*, 93 N.Y.2d 352, 356, 690 N.Y.S.2d 483, 486, 712 N.E.2d 652 (1999), then that evidence by definition could not have created a reasonable doubt that did not otherwise exist. Thus, for the same reasons just discussed, exclusion of UD 53's answer would not have been an error of constitutional magnitude even if it had been a state law evidentiary error.

## B. Preclusion of the chemist's answer was not erroneous.

Perhaps in response to the trial court's precluding the undercover from answering defense counsel's question as to the average weight of a $5 vial of cocaine on the ground that it called for expertise in chemical analysis, defense counsel posed substantially the same question to the chemist Hassan, who had been qualified as an expert in the analysis of controlled substances. On this occasion, however, the trial court sustained a general objection to the question.

> The trial court did not err in doing so. "When evidence is excluded upon a mere general objection, the ruling will be upheld, if any ground in fact existed for the exclusion. It will be assumed, in the absence of any request by the opposing party or the court to make the objection definite, that it was understood, and that the ruling was placed upon the right ground."

*Bloodgood*, 293 N.Y. at 311, 56 N.E.2d at 719 (quoting *Tooley*, 70 N.Y. at 37). Here, defense counsel did not seek clarification of the basis of the trial court's ruling, and there was an available ground for the objection, viz., relevance. Because, as discussed above, *supra* § 1(b)(iii)(A), the testimony that defense counsel was seeking to elicit was in fact irrelevant, it will be assumed that the trial court sustained the objection on that ground. Accordingly,

the ruling was not erroneous as a matter of state evidentiary law, much less an error of constitutional magnitude.

## C. Preclusion of testimony regarding Jones's prior dismissals was a constitutional error.

 Prohibiting Jones from testifying about previous dismissals was a clear evidentiary error, and the Appellate Division majority did not even dispute that it was, see *Jones*, 239 A.D.2d at 603–04, 658 N.Y.S.2d at 368 (holding instead that the ruling did not interfere with Jones's defense). There is no ground upon which the prosecutor's general objection to the question could have been properly sustained. Respondent argues that the evidence could have been excluded as propensity evidence. (Resp't's Mem. Opp. at 36–39 (citing, inter alia, *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir.1990) ("A defendant may not seek to establish his innocence, however, through proof of the absence of criminal acts on specific occasions.")).) While it is certainly true that evidence of prior acts cannot be admitted solely for the purpose of showing the defendant's criminal propensity (or lack thereof), see *People v. Blair*, 90 N.Y.2d 1003, 1004–05, 665 N.Y.S.2d 629, 629–30, 688 N.E.2d 503 (1997), it is equally well-settled under New York law that evidence of prior acts can be admitted for a range of other purposes, including, but not limited to, proof of motive, intent, absence of mistake or accident, common scheme or plan, or identity, see *People v. Molineux*, 168 N.Y. 264, 293, 61 N.E. 286, 294 (1901); *cf.* Fed.R.Evid. 404(b) (codifying the *Molineux* rule in the federal system). In this case, as observed by the dissenters in the Appellate Division, evidence of Jones's past practice of selling baking soda in lieu of cocaine, should have been admitted to show a common plan or scheme, *presence* of a mistake,[25] or lack of intent to sell a substance he knew to be cocaine. *See*

---

25. This case presented something of a "reverse *Molineux*" scenario in that, instead of having the prosecutor seek to admit prior convictions to show the absence of a mistake, as is generally the case, the defendant was

seeking to admit prior dismissals to show the existence of a mistake. However, nothing in the New York case law suggests that the *Moli-*

*Jones*, 239 A.D.2d at 605, 658 N.Y.S.2d at 369 (Friedman, J., dissenting) (citing numerous cases). Evidence of the prior arrests and dismissals would have corroborated Jones's defense of having intended only to sell baking soda and was thus directly relevant to the only contested issue in the case: Jones's state of mind when he sold the three red-capped vials to UD 53.

 This error took on constitutional dimensions because Jones's testimony regarding the prior arrests and dismissals could have created a reasonable doubt that did not otherwise exist. *See Agurs*, 427 U.S. at 112–13, 96 S.Ct. at 2401–02; *Justice*, 90 F.3d at 47. In the context of the other evidence adduced at trial, evidence that Jones had actually been arrested on three previous occasions for sale of what, on chemical analysis by the police themselves, proved not to be cocaine could have provided substantial corroboration—that did not otherwise exist at all—of his claim of having inadvertently sold cocaine to UD 53. As the Appellate Division majority notes, evidence was presented to the jury that there at least exists a practice of selling "beat" on the street and that individuals can get away with the practice because even experts cannot tell the difference between an innocuous substance such as baking soda and cocaine just by looking at it. But this evidence, by itself, was no substitute for evidence that Jones himself was one of those individuals. Because of the trial court's erroneous ruling, the only evidence that the jury had that Jones was someone who sold "beat" was his own testimony that he had done so on previous occasions. The jury was entitled to judge, and, no doubt, did judge, this testimony to be too self-serving to be credible. Jones's credibility problem was further compounded by the prior felony conviction the prosecutor forced him to reveal on cross-exami-

nation. It was thus absolutely vital to Jones's defense that he be able to present some evidence on this crucial question other than his own unsupported word. By erroneously denying Jones the opportunity to present any facts to the jury that would corroborate his story, the trial court denied him a meaningful opportunity to present his defense, and, hence a fair trial.

Moreover, this is one of those close cases in which a little additional evidence, especially such crucial evidence, could have made a difference to the outcome. *See Agurs*, 427 U.S. at 112–13, 96 S.Ct. at 2401–02; *Rosario*, 839 F.2d at 925. Despite the apparent simplicity of the case and the fact that only two days of testimony were given, the jury, which had an opportunity to observe Jones's demeanor as he testified, deliberated for five and a half to seven hours before returning a verdict of guilty.[26]

For these reasons, to the extent that the Appellate Division's conclusion that "the trial court's rulings did not deny the defendant a fair trial," *Jones*, 239 A.D.2d at 604, 658 N.Y.S.2d at 368, reflects a determination that the excluded testimony regarding Jones's prior arrests and dismissals could not have created a reasonable doubt that did not otherwise exist, the Appellate Division's dismissal of the claim was an objectively unreasonable application of the relevant clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) (Supp.1999); *Williams*, —— U.S. at ——, 120 S.Ct. at 1521. Accordingly, on this claim, Jones's application for a writ of habeas corpus is granted.

### (2)

### Petitioner's remaining claims are without merit.

Petitioner's remaining sufficiency of the evidence and courtroom closure claims are

---

*neux* use of prior act evidence is available only to the prosecution.

**26.** The jury began deliberations at 12:10 p.m. and returned a verdict at 7:00 p.m. (Tr. 463, 477.) During those seven hours, the jury

spent approximately 35 minutes listening to read backs and supplemental instructions, (*id.* at 469–77), and up to an hour waiting for the court's response to a note sent by one of the jurors indicating that she felt ill, (*id.* at 464–65).

moot In light of this court's holding on petitioner's fair trial claim and, in any event, are without merit.[27]

### a. The evidence was sufficient to support the verdict.

 Petitioner argues that the evidence submitted at trial was insufficient to support a finding that he had the requisite intent to sell cocaine. The argument has no merit. As a matter of due process, evidence adduced at trial is sufficient to support a conviction if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In this case, an undercover officer approached Jones, asked (in so many words) for cocaine, and Jones sold him three vials, each of which tested positive for cocaine. The evidence was, therefore, sufficient for a rational trier of fact to find Jones guilty. *See, e.g., People v. Phillip,* 215 A.D.2d 598, 598, 626 N.Y.S.2d 848, 849 (2d Dep't) (holding similar evidence sufficient to support conviction in buy-and-bust case), *appeal denied,* 87 N.Y.2d 849, 638 N.Y.S.2d 608, 661 N.E.2d 1390 (1995) (Table); *People v. Simeona,* 194 A.D.2d 701, 702, 598 N.Y.S.2d 337, 338 (2d Dep't) (same), *appeal denied,* 82 N.Y.2d 726, 602 N.Y.S.2d 824, 622 N.E.2d 325 (1993) (Table); *People v. Ross,* 184 A.D.2d 670, 670–71, 584 N.Y.S.2d 874, 874–75 (2d Dep't) (same), *appeal denied,* 80 N.Y.2d 909, 588 N.Y.S.2d 834, 602 N.E.2d 242 (1992), *habeas petition dismissed,* 101 F.3d 687, 1996 WL 346669 (2d Cir.1996) (Table). Moreover, the improbability of Jones's having placed red-caps on all and only those vials that contained a trace amount of cocaine was emphasized by the prosecutor in summation and gave the jury a sufficient reason to reject his claim that he was unaware that the vials contained cocaine. (*See* Tr. 429.) The real problem with the verdict in this case was not that the prosecution did not present enough evidence in support of its case, but rather that Jones was not allowed to fully present his. Thus, on the question of sufficiency, the Appellate Division's decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) (Supp.1999); *Williams,* —— U.S. at ——, 120 S.Ct. at 1523.

### b. Petitioner was not denied a public trial.

 Finally, Jones claims that the closure of the courtroom during the testimony of the two undercover officers, UD 53 and UO 7430, violated his Sixth Amendment right to a public trial. Again, the argument has no merit.

 The Sixth Amendment guarantees an accused the right to a public trial. *See* U.S. Const. amend. VI; *Waller v. Georgia,* 467 U.S. 39, 46, 104 S.Ct. 2210, 2215, 81 L.Ed.2d 31 (1984); *Ayala v. Speckard,* 131 F.3d 62, 68–69 (2d Cir.1997) (en banc). That right, however, is not absolute, and under exigent circumstances, a courtroom may be closed. *See Waller,* 467 U.S. at 45, 104 S.Ct. at 2215; *Ayala,* 131 F.3d at 69. Closure is constitutionally permissible when (1) the party seeking closure advances an overriding interest that an open courtroom would likely prejudice; (2) the closure is no broader than necessary to protect the interest; (3) the trial court considers, if suggested, reasonable alternatives to closure; and (4) the trial court makes adequate findings to support its ruling. *See Waller,* 467 U.S. at 48, 104 S.Ct. at 2216; *Ayala,* 131 F.3d at 69, 70–72.

In this case, all four of the *Waller* conditions were satisfied. First, the state had a sufficiently substantial interest in maintaining the effectiveness of the undercover officers, and hence the secrecy of their identities, to justify closure during their testimony. *See Ayala,* 131 F.3d at 72 (holding that the "state interest in main-

---

**27.** Because the remaining claims are so clearly without merit, an analysis of whether they are barred by a state procedural default will not be undertaken.

taining the continued effectiveness of an undercover officer is an extremely substantial interest"). The testimony offered by the two undercover officers to demonstrate a threat to this interest defined with sufficient geographical particularity the area of the operation to which the officers would return and in which trial audience members might reside. *See Brown v. Andrews,* 180 F.3d 403, 406–07 (2d Cir.1999), *reh'g en banc granted,* No. 98–2717 (Mar. 8, 2000). Both officers testified, and the trial court found, that, in the preceding week or so, they had worked in an undercover capacity at the very same intersection where Jones was arrested, as well as in the immediate vicinity of the courthouse, and could be working in those areas again as soon as the next day. (Tr. 161–174, 178–82.) [28]

Second, the closure here was no broader than necessary to protect the state's interest in the continued effectiveness of the undercover officers' operation. The courtroom was closed only during the testimony of the two undercover officers, and the transcript of their testimony was not sealed. *See Brown v. Kuhlmann,* 142 F.3d 529, 536, 538 (2d Cir.1998); *Ayala,* 131 F.3d at 72; *see also Campbell v. Sa-*

*bourin,* 37 F.Supp.2d 601, 604–05 (E.D.N.Y.1999) (noting that presence of the jury and public availability of the transcript attenuates the "specter of the 'secret trial'" that motivated ratification of the Public Trial Clause). Third, the trial court considered, and ordered, a reasonable alternative to closure, namely, limited closure during the testimony of the two officers. Defense counsel did not suggest any other alternative, and the trial court had no obligation under *Waller* to consider sua sponte further alternatives to the partial closure it had already deemed appropriate. *See Ayala,* 131 F.3d at 71.

Finally, the trial court made adequate findings of fact on the record to support the partial closure. (*See* Tr. 178–182.)

Accordingly, to the extent that the Appellate Division's holding that Jones's "remaining contentions are without merit," *Jones,* 239 A.D.2d at 604, 658 N.Y.S.2d at 368, represents its assessment of Jones's courtroom closure claim, its decision was not contrary to, nor did it involve an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1) (Supp.1999); *Williams,* —— U.S. at ——, 120 S.Ct. at 1523.[29]

---

**28.** *Compare Andrews,* 180 F.3d at 407 (testimony that undercover officer expected to return to work in the "streets of Manhattan" was not geographically specific enough to establish a serious risk to the state's interest in maintaining the officer's effectiveness), *with Ayala,* 131 F.3d at 72 (testimony that three undercover officers would be returning to "the area around 1006 Intervale Avenue," "Cooper Square," and "West 42nd Street and Eighth Avenue," respectively, was sufficiently particularized to establish an overriding interest in continued effectiveness).

**29.** Given this court's holding that the courtroom closure was justified by the trial court's findings regarding the impact that undercover officers' testimony in open court would have on their continued effectiveness, the question of whether the trial court's alternative justification in terms of risk to the officers' personal safety was sufficient to warrant closure need not be reached. The answer to the latter question is somewhat uncertain in light of recent, conflicting decisions of the Second Circuit on the issue. *Compare Andrews,* 180

F.3d at 407–09 (record was not adequate to justify closure of courtroom during the testimony of an undercover officer in the interest of the officer's safety, where the officer was a party to the subject buy-and-bust deal and where officer testified that he had 100 to 150 open cases but did not state how many were pending in the courthouse where he was to testify and there was no indication on the record of what steps, if any, the officer had taken to conceal his identity when he entered the courthouse), *with Nieblas v. Smith,* 204 F.3d 29, 30, 33 (2d Cir.1999) (closure of courtroom during the testimony of an undercover officer who was a party to the subject buy-and-bust deal was justified for "safety reasons" where the officer testified that he might be assigned to further undercover work in the neighborhood where the defendant was arrested). Notably, the Second Circuit has recently decided to rehear the *Andrews* case en banc in order to clarify the standards for justifying courtroom closure. *See Brown v. Andrews,* No. 98–2717 (2d Cir. Mar. 8, 2000) (order granting petition for rehearing en banc).

## Conclusion

Charles Jones's story may or may not be true, but he was entitled to have a jury decide whether it was. Because the trial court's erroneous evidentiary ruling unconstitutionally prevented him from presenting his defense to the jury, petitioner's application for a writ of habeas corpus is granted. Respondent is ordered to release Jones from custody unless a new trial on the underlying indictment is commenced against Jones within sixty (60) days of the date of entry of this order.