OPINION OF THE COURT
 

 Levine, J.
 

 Defendant appeals, pursuant to permission granted by a Judge of this Court, from an order of the Appellate Division (251 AD2d 210) affirming his convictions by a jury of criminal
 
 *355
 
 sale of a controlled substance in the third degree (Penal Law § 220.39 [1]) and bail jumping in the first degree (Penal Law § 215.57). At issue is the propriety of the trial court’s decision to allow the introduction of negative identification testimony on the sale of a controlled substance charge, and whether, on the prosecution’s proof, the maximum bail jumping offense of which defendant could have been convicted was bail jumping in the second degree. We conclude that the trial court did not abuse its discretion in allowing the negative identification testimony. Nevertheless, the uncontested facts do not support defendant’s conviction for bail jumping in the first degree. Therefore, we now modify the judgment by reducing defendant’s conviction to bail jumping in the second degree (Penal Law § 215.56), and, as so modified, affirm.
 

 On December 27, 1995, defendant was arraigned in Criminal Court on a felony complaint charging criminal sale of a controlled substance in the third degree. Bail was set at $750 and the case was adjourned for two days. However, on December 29, since defendant was neither afforded a hearing nor indicted in compliance with the time constraints of CPL 180.80, Criminal Court released defendant from custody on his own recognizance and directed him to appear before it on February 23, 1996
 
 (see,
 
 CPL 180.80). On February 14, 1996, however, defendant was indicted, and the action was transferred to Supreme Court
 
 (see,
 
 CPL 210.10 [2]). When defendant failed to appear in Supreme Court on February 23, the court issued a warrant, but stayed its execution because of the absence of any indication in the record that defendant had been notified of his obligation to appear in Supreme Court. The proceedings were adjourned until March 8, 1996, but no new securing order was issued. Thus, it is apparent that the court allowed defendant to remain at liberty pursuant to the prior Criminal Court order.
 

 When defendant again failed to appear on March 8, the court lifted the stay on the warrant. Defendant was arrested and brought before the court on May 16, 1996. Thereafter, he was indicted for first degree bail jumping, in connection with his failure to appear within 30 days after March 8, 1996
 
 (see,
 
 Penal Law § 215.57). On the People’s motion, the controlled substance and bail jumping indictments were consolidated and defendant proceeded to trial on both charges.
 

 At trial, undercover police detective Preston Brown testified to his participation in a buy/bust operation where a black male, about 6 feet tall, weighing 200 pounds, with a little facial hair and a scar on his left cheek, wearing a black “bubble” coat with
 
 *356
 
 brown paint spattered on the sleeve, a black ski hat, blue jeans and tan boots, directed the detective to a second individual who provided him with cocaine and accepted payment. Detective Brown identified defendant at trial as the “steerer” in this transaction. In addition, over defense counsel’s objection, Detective Brown was permitted to testify that when other officers apprehended a suspect later that afternoon, a black male wearing a black bubble jacket and a black ski hat, he observed the suspect and told the officers that it was not the individual who had participated in the drug sale. That suspect ultimately was exonerated from any complicity in the sale.
 

 I.
 

 A majority of this Court has never reached the issue of whether negative identification evidence is admissible as evidence-in-chief in a criminal case, but there have been two conflicting views expressed on the issue in separate opinions. In his concurring opinion in
 
 People v Bolden
 
 (58 NY2d 741), Judge Gabrielli concluded that negative identification testimony is relevant and admissible as evidence-in-chief where the reliability of an eyewitness identification is at issue
 
 (id.,
 
 at 744). Judge Meyer took a much different position in his dissent in
 
 People v Gonzalez
 
 (55 NY2d 720,
 
 cert denied
 
 456 US 1010), where he opined, in the context of a rape case, that such evidence is both nonprobative and hearsay, and “could become probative and admissible, if at all, only when the defense offered evidence intended to show, for example, that the victim was so eager to avenge the crimes committed upon her that she accused the first persons brought before her for viewing”
 
 (id.,
 
 at 724-725).
 

 On this appeal, defendant essentially urges that we adopt the dissenting view in
 
 Gonzalez.
 
 We conclude, instead, that the standard articulated by the concurrence in
 
 Bolden
 
 is appropriate; namely, that “[a]s a general proposition, negative identification evidence will be relevant in certain circumstances”
 
 (People v Bolden, supra,
 
 58 NY2d, at 744). Notably, “[w]hen the reliability of an eyewitness identification is at issue, negative identification evidence can tend to prove that the eyewitness possessed the ability to distinguish the particular features of the perpetrator”
 
 (id.).
 

 In general, all evidence that “has any tendency in reason to prove the existence of any material fact, i.e., it makes determination of the action more probable or less probable than it would be without the evidence,” is relevant and admissible un
 
 *357
 
 less its admission would violate some exclusionary rule
 
 (People v Scarola,
 
 71 NY2d 769, 777; Prince, Richardson on Evidence § 4-101, at 136 [Farrell 11th ed]). It follows that evidence that enhances the likelihood of the accuracy of an eyewitness identification is relevant. Thus, in
 
 People v Tunstall
 
 (63 NY2d 1, 10), we affirmed the Appellate Division’s holding that it was permissible to introduce a videotape of a lineup in which the defendant was identified because “[t]he use of videotape provides an effective tool for assessing the weight and credibility to be assigned by the fact finder to the identifying witness’ testimony”
 
 (People v Tunstall,
 
 97 AD2d 523, 524). Likewise, in
 
 People v Huertas
 
 (75 NY2d 487, 493), we concluded that testimony by the eyewitness of her prior description of the perpetrator was relevant because it “assists the jury in evaluating the witness’s opportunity to observe at the time of the crime, and the reliability of her memory at the time of the corporeal identification — both important aspects of the critical issue.”
 

 Where, as here, the reliability of an eyewitness identification is at issue, negative identification evidence serves the same purpose as did the other forms of out-of-court identification evidence in
 
 Tunstall
 
 and
 
 Huertas.
 
 Through his negative identification testimony, the eyewitness demonstrated that he was able to distinguish the actual perpetrator from another suspect who was dressed in nearly identical clothing and shared common racial and gender characteristics with the perpetrator. Thus, the negative identification evidence was probative in enhancing the reliability of the undercover officer’s in-court identification. Indeed, such evidence is not unlike lineup evidence, where the jury is given the opportunity to assess the witness’s ability to recognize the defendant in conjunction with his or her ability to eliminate other, similar suspects
 
 (see, People v Bolden, supra,
 
 58 NY2d, at 744). An eyewitness’s ability to select the perpetrator from a lineup of suspects that are close in appearance to the perpetrator enhances the credibility of the witness
 
 (see, People v Tunstall, supra,
 
 97 AD2d, at 524).
 

 Alternatively, defendant argues that even under the
 
 Bolden
 
 rule, the negative identification testimony at issue here should not have been admitted because the People failed to demonstrate “some similarity between the features of the individuals the eyewitness declined to identify and the features of the defendant”
 
 (People v Bolden,
 
 58 NY2d, at 745,
 
 supra).
 
 We disagree. There was sufficient similarity, previously described, to establish at least threshold relevancy. Once rele
 
 *358
 
 vancy is established, admissibility becomes a discretionary determination by the trial court as to whether the evidence’s probative value is outweighed by any prejudicial impact on the defendant
 
 (see, People v Scarola, supra,
 
 at 777). As with a lineup, the probative value of negative identification evidence will be proportional to the similarity between the subject of the negative identification and the perpetrator
 
 (see, People v Tunstall, supra,
 
 97 AD2d, at 524;
 
 People v Bolden, supra, 58
 
 NY2d, at 745). Here, the suspect whom Detective Brown ruled out was of the same race and sex as the steerer in the drug transaction and, significantly, was wearing the same kind of jacket and hat. Under these circumstances, we cannot say that the trial court abused its discretion in finding the evidence sufficiently probative to warrant admission.
 

 II.
 

 Defendant also requests that his conviction for first degree bail jumping be reduced to second degree bail jumping, arguing that he cannot be guilty of the higher offense because an indictment was not pending at the time he was ordered to reappear on his own recognizance
 
 (cf., People v Eiffel,
 
 81 NY2d 480 [addressing the contrasting situation where an indictment which had been pending when defendant was released was subsequently dismissed after the defendant’s nonappearance]).
 

 Penal Law § 215.57 defines bail jumping in the first degree as follows:
 

 “A
 
 person is guilty of bail jumping in the first degree when
 
 by court order
 
 he has been released from custody or allowed to remain at liberty, either upon bail or upon his own recognizance,
 
 upon condition
 
 that he will subsequently appear personally
 
 in connection with an indictment pending against him which charges him with the commission of a class A or class B felony,
 
 and when he does not appear personally on the required date or voluntarily within thirty days thereafter” (emphasis supplied).
 

 The statutory definition sets forth distinctive elements of the crime of first degree bail jumping. The pertinent elements here are that: (1) the defendant was released from custody or allowed to remain at liberty by a court order; (2) the order expressly imposed a condition that the defendant later appear personally in connection with a
 
 pending
 
 criminal charge; and
 
 *359
 
 (3) the pending charge referred to in the order was an indictment for a class A or B felony.
 

 The degree of the bail jumping crime is premised upon the seriousness of the pending charge upon which the order requires defendant to later appear. Thus, bail jumping in the third degree is committed where an absconding defendant was released by a court order which imposed the condition “that he will subsequently appear personally in connection with a criminal action or proceeding” (Penal Law § 215.55) and bail jumping in the second degree is committed when the nonappearing defendant was released by a court order which imposed the condition “that he will subsequently appear personally in connection with a charge against him of committing a felony” (Penal Law § 215.56). First degree bail jumping is set apart from the lesser offenses in that the court order that the defendant violated must have conditioned his release from custody, or continued liberty, on his appearance in connection with a pending
 
 indictment
 
 for an A or B felony
 
 (see,
 
 Mem of NY Law Enforcement Council, 1983 NY Legis Ann, at 123 [statute’s “more onerous provisions (are) triggered only in those cases where indictments have already been returned”]).
 

 When defendant was originally released by court order on December 29, 1995 it was not on condition that he reappear in connection with a pending indictment because the indictment had not yet been returned. On February 23, 1996 the indictment was pending, but Supreme Court did not issue a new securing order, as it would have if, for example, defendant had been arraigned on the then pending indictment
 
 (see,
 
 CPL 210.15 [6];
 
 see also,
 
 CPL 180.10 [6] [requiring court to issue securing order upon arraignment on felony complaint]). Instead, the court merely adjourned the proceeding, allowing defendant to remain at liberty pursuant to the prior Criminal Court order. Thus, at no point did a court issue a securing order directing defendant to “subsequently appear personally in connection with an indictment pending against him which charges him with the commission of a class A or class B felony” (Penal Law § 215.57), the distinguishing element of bail jumping in the first degree.
 

 Defendant’s failure to appear on March 8, 1996 therefore, could not trigger liability for first degree bail jumping, but only the lesser offense of second degree bail jumping, which requires that defendant failed to meet a condition imposed in connection with a pending felony complaint
 
 (see,
 
 Penal Law § 215.56). As the condition to appear imposed on defendant on December
 
 *360
 
 29, 1995 by Criminal Court was in connection with a felony complaint, defendant is guilty of the lesser offense for failing to appear within 30 days after the March 8, 1996 required date.
 
 *
 

 Accordingly, the order of the Appellate Division should be modified by reducing defendant’s conviction of bail jumping in the first degree to bail jumping in the second degree and remitting to Supreme Court for resentencing, and otherwise affirmed.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick, Wesley and Rosenblatt concur.
 

 Order modified by reducing defendant’s conviction of bail jumping in the first degree to bail jumping in the second degree and remitting to Supreme Court, New York County, for resentencing and, as so modified, affirmed.
 

 *
 

 We note that defendant’s criminal liability is premised on his failure to appear on March 8, 1996, rather than his failure to appear on February 23, 1996, because the trial court excused defendant’s initial absence (see,
 
 People v Coppez,
 
 93 NY2d 249 [decided today]).