

NUMBER 13-10-00452-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

JASON HENDERSHOT                                          Appellant,
AKA JASON HENDERSHOTT,

**v.**

THE STATE OF TEXAS,                                          Appellee.

**On appeal from the 148th District Court
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Garza and Vela
Memorandum Opinion by Justice Garza**

Appellant, Jason Hendershot aka Jason Hendershott, challenges his conviction
on eight first-degree felony counts of aggravated sexual assault of a child, two first-
degree felony counts of aggravated kidnapping, and two second-degree felony counts
of indecency with a child.   *See* TEX. PENAL CODE ANN. §§ 20.04 (aggravated

kidnapping), 21.11 (indecency with a child) (West 2011), § 22.021 (aggravated sexual assault of a child) (West Supp. 2011). A jury assessed punishment at life imprisonment for each of the first-degree felonies and twenty years' imprisonment for the indecency charges, with the sentences to run concurrently. Hendershot raises seven issues on appeal. We affirm.

## I. BACKGROUND

T.K. testified that, on May 19, 2007, when she was 14 years old, she was vacationing at a beach house in Aransas Pass, Texas, with her friend, K.V., and K.V.'s mother and sister. K.V. was 15 years old at the time. While at the beach, T.K. and K.V. met two high-school-age boys, identified as Stephen and Chris, and spent several hours playing and swimming with them at the beach. At some point, Stephen introduced the girls to his father, Noe Hernandez, and Hernandez's friend, Hendershot. The group spent some time riding around the beach in Hernandez's black Ford truck.

Stephen and Chris dropped T.K. and K.V. off in the afternoon and agreed to meet up later to go to a bonfire at the beach. T.K. left her phone number on Hernandez's cell phone, since he shared the phone with his son. That evening, T.K. received a call that she believed was from Chris. The caller invited T.K. and K.V. to the bonfire and asked to meet up at the beach. The girls snuck out of the house they were staying in, walked to the beach, and saw the black Ford truck waiting for them. They were surprised to find only Hernandez and Hendershot waiting inside the truck. The men said they were there to pick up the girls and take them to meet Stephen and Chris at the bonfire. T.K. and K.V. got in the truck and sat in between Hernandez and Hendershot in the front seat. According to the testimony of both T.K. and K.V., Hernandez drove the truck for approximately thirty minutes to an hour, and they ended

2

up in a remote, deserted area of the beach.

T.K. testified that Hernandez then pulled K.V. from the truck by her hair, and Hendershot grabbed her cell phone and broke it "in half." Hendershot then put his hand around T.K.'s neck, pinned her down on the front seat and told her to undress, and threatened to kill her and "hunt down" and kill her family if she did not comply. Hendershot then forced T.K. to engage in various sex acts. T.K. stated that Hernandez then pulled her out of the cab and took her into the bed of the truck, where he forced T.K. to engage in various sex acts.

K.V. testified that Hernandez pulled her by the hair to the bed of the truck and tried to remove her clothes. K.V. resisted, so Hernandez slapped her in the face and forcibly removed her clothes. Hernandez then forced K.V. to engage in various sex acts. She testified that Hendershot then came to the back of the truck "a few minutes later" and forced her to engage in various sex acts. According to K.V., Hernandez told the girls that if they told anyone about what happened, "he would find us and kill our family and us."

Both T.K. and K.V. testified that, after the ordeal, Hernandez poured water on the girls' genital areas in order to clean them off, and he told them to rinse out their mouths with mouthwash. T.K. and K.V. got back in the truck and Hernandez and Hendershot drove them back to the area where they had initially met. Fearing that the men would "hunt [them] down," T.K. and K.V. returned to the beach house and went to sleep without reporting the assaults. The next morning, the group returned to their home in Cedar Park, Texas. The following day, a Monday, T.K. came over to K.V.'s house so the two could walk to school together. When T.K. arrived, according to K.V., "we started to just cry and we knew we had to tell our parents what had happened." Police were

3

called and the girls submitted to physical examinations at a hospital.

Julie Gibbs, the sexual assault nurse examiner that performed the physical examinations, testified that the results indicated that both girls had minor injuries to their genital areas that were consistent with having suffered sexual assault.

Robin Castro, a forensic scientist with the Texas Department of Public Safety ("DPS"), testified that she performed testing on evidence obtained from the girls' bodies and clothing. Castro stated that K.V.'s underwear contained DNA from her as well as an unknown male, and that neither Hendershot nor Hernandez could be excluded as contributors of that DNA. Castro also stated that there were sperm cells recovered from T.K.'s body and that Hernandez could not be excluded as a contributor of those cells, but Hendershot could be excluded.

After the sexual assault examinations, T.K. and K.V. gave statements to police in which they described the assailants and the truck in which the assaults occurred. After subsequent police investigation, T.K. and K.V. each were presented with two photo lineups. Both girls identified Hendershot and Hernandez as the individuals that assaulted them. The men were arrested and tried together. Both were convicted on all counts and sentenced to multiple terms of life imprisonment. Hendershot's appeal followed.[1]

## II. DISCUSSION

### A. Media Presence in Courtroom

---

[1] Hernandez also appealed his conviction, and we affirmed. *Hernandez v. State*, No. 13-10-00473-CR, 2012 Tex. App. LEXIS 2546 (Tex. App.—Corpus Christi Mar. 29, 2012, pet. filed) (mem. op., not designated for publication).

By his first issue, Hendershot argues that the trial court erred by allowing cameras in the courtroom.[2] The reporter's record shows that the following colloquy occurred immediately before the jury was asked to enter the courtroom for the first day of trial:

[Hendershot's counsel]: I'd like to object to the cameras being allowed in the courtroom, Your Honor. This case has been covered extensively by the media and I don't want the fact that the media is present to affect anybody's decision or anybody's presentation of this case. And I believe we've leveled the playing field, if the media was not allow[ed] in the courtroom. I believe their being in courtroom is prejudice to my client.

THE COURT: How so, sir?

[Hendershot's counsel]: Again, Your Honor, I believe, it's going to—I think it will have an [e]ffect on how this case is presented, how decisions are made in this case.

THE COURT: How so, sir?

[Hendershot's counsel]: With them being in the courtroom.

THE COURT: How so, sir?

[Hendershot's counsel]: That—that's how, Your Honor.

THE COURT: Well, but how would decision making—and you haven't identified the person, but how would decision making be affected?

[Hendershot's counsel]: Your Honor, I don't want some—I don't want a thought process to be affected by the fact that the media may be second-guessing a situation.

THE COURT: Not having—

---

[2] Hendershot's issue complains that the trial court allowed cameras in the courtroom "during jury selection." However, his citations to the reporter's record reflect that he is complaining about the presence of cameras in the courtroom during the guilt/innocence phase of the trial.

| [Hendershot's counsel]: | Anybody's thought process, Judge. And that goes for the prosecution, the Court, defense counsel. |
|---|---|
| THE COURT: | I've not heard much specificity to the objection. The objection's overruled. |

Hendershot bases his argument on *Estes v. Texas*, 381 U.S. 532 (1965), a decades-old United States Supreme Court case. In *Estes*, the Court concluded that the defendant was denied his right to due process because the intrusion of press and television equipment in the courtroom during his trial led to a "circus" atmosphere. *See id.* at 605 n.3. Hendershot concedes that the situation in his case was not the "circus" as in *Estes*, but he claims that "the media presence potentially caused an inappropriate situation with jurors on the first day of trial." We disagree. In *Chandler v. Florida*, the United States Supreme Court stated that *Estes* "is not to be read as announcing a constitutional rule barring still photographic, radio, and television coverage in all cases and under all circumstances." 449 U.S. 560, 573 (1981). Instead, a defendant bears the burden to show

> with . . . specificity that the presence of cameras impaired the ability of the jurors to decide the case on only the evidence before them or that [the] trial was affected adversely by the impact on any of the participants of the presence of cameras and the prospect of broadcast.

*Id.* at 581; *see Houston Chronicle Publ'g Co. v. Shaver*, 630 S.W.2d 927, 933 (Tex. Crim. App. 1983); *see also Graham v. State*, 96 S.W.3d 658, 660 (Tex. App.—Texarkana 2003, pet. ref'd) (recognizing that "broadcast camera equipment circa 2001 is a far cry from the black and white pedestal cameras used in 1964" and "is typically fairly unobtrusive").

Hendershot's appellate counsel, like his trial counsel, and like the appellant in *Chandler*, is unable to articulate with any specificity how or why the presence of

6

cameras in the courtroom "impaired the ability of the jurors to decide the case on only the evidence before them" or adversely affected the trial. *Chandler*, 449 U.S. at 581. Accordingly, we cannot say that Hendershot was denied due process. His first issue is overruled.

## B. Admission of Evidence

Hendershot's second through sixth issues each allege that the trial court improperly admitted evidence at trial. We review a trial court's decision to admit evidence under an abuse of discretion standard. *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Id.*

### 1. Lineup Admonishments

By his second issue, Hendershot contends that the trial court erroneously admitted evidence of admonishments given prior to one of the photo lineups. He claims they are inadmissible hearsay.

During the testimony of Texas Ranger Roberto Garza, who investigated the case, the State introduced into evidence a form containing written admonishments. Ranger Garza testified that he presented the form to K.V. prior to having her view a photo lineup. The form states:

> In a moment, you will be shown a group of photographs. The group of photographs may or may not contain a picture of the person who committed the crime now being investigated. Keep in mind that hair styles, hair color, beards, and mustaches may be easily changed. Also, photographs may not always depict the true complexion of a person—it may be lighter or darker than shown the in photograph. Pay no attention to any markings or numbers that may appear on the photographs or any differences in the type or style of the photographs. When you have looked at all the photographs, tell me whether or not you see the person who committed the crime. Please do not tell any of the other witnesses that you have or have not identified anyone.

7

The form was initialed by K.V. and signed by Ranger Garza. Additionally, Ranger Garza read the admonitions aloud at trial at the request of the prosecutor. Hendershot's counsel objected and the trial court overruled the objection. Subsequently, the State offered into evidence the very same form as presented to and initialed by T.K. Defense counsel did not object.

This issue fails on a number of levels. First, Hendershot failed to preserve it for our review. To preserve error in admitting evidence, a party must object each time the inadmissible evidence is offered or obtain a running objection. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (citing *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). Hendershot's trial counsel did not object to the admonishment form when it was admitted a second time and he did not obtain a running objection. Second, the admonishments are not hearsay. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." TEX. R. EVID. 801(d). "An extrajudicial statement or writing which is offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *see Fischer v. State*, 207 S.W.3d 846, 851 (Tex. App.—Houston [14th Dist.] 2006) (noting that "questions and instructions" given to a suspect "are not statements offered to prove the truth of the matter asserted, and thus, are not inadmissible hearsay"), *aff'd*, 252 S.W.3d 375 (Tex. Crim. App. 2008). Finally, Hendershot has not made any argument as to how or why his "substantial rights" were harmed by the admission of the testimony. *See* TEX. R. APP. P. 44.2(b) (stating that, for non-constitutional error in a criminal case, we must

8

disregard errors that do not "affect substantial rights"); *see also Yanez v. State*, 199 S.W.3d 293, 308 (Tex. App.—Corpus Christi 2006, pet. ref'd) ("The admission of inadmissible hearsay constitutes non-constitutional error, and it will be considered harmless if the appellate court, after examining the record as a whole, is reasonably assured that the error did not influence the jury verdict or had but a slight effect.").

We overrule Hendershot's second issue.

### 2. Interview Admonishments

By his third issue, Hendershot complains of the trial court's admission of a "Warning and Waiver of Rights" form that was read to Hernandez prior to a police interview. The form, which contained standard *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 444 (1966), was offered into evidence by the State during Ranger Garza's testimony, immediately prior to offering a video recording of the interview itself, which also contained the admonishments. Hendershot's counsel objected to the admission of the admonishment form and the interview on the basis that they violate the best evidence rule. *See* TEX. R. EVID. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required except as otherwise provided in these rules or by law.") On appeal, only the admission of the admonishment form is contested.

Hendershot appears to argue that the admission of the written admonishments violated the best evidence rule because the video recording containing the same admonishments was the "original" under Rule 1002. We need not decide the merits of the issue because Henderson has not provided any argument as to how or why his "substantial rights" were affected by the admission of evidence of written

9

admonishments given to his co-defendant.  *See* TEX. R. APP. P. 44.2(b).  Any error, therefore, is harmless.  *See id.*  We overrule Hendershot's third issue.

### 3.  Lineup Photographs

Henderson argues by his fourth issue that the trial court erred by admitting additional photographs from a lineup array which he contends are "not relevant to any issue in the case."  Evidence is relevant, and generally admissible, if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401, 402.[3]

Ranger Garza testified that, after identifying Hernandez as one of the two assailants, he reviewed Hernandez's phone records and was able to identify two individuals whom he suspected might be the second assailant—Hendershot and another man (referred to herein as the "second suspect").  Ranger Garza then showed both T.K. and K.V. two separate photo lineups, one featuring Hendershot and one featuring the second suspect.  Each photo lineup depicted six visages overall.  Both victims picked Hendershot out of the lineup featuring him; and neither picked out anyone from the lineup featuring the second suspect.  Hendershot complains that the trial court admitted, over his trial counsel's objections, evidence of the photo lineups featuring the second suspect.  He claims that this evidence "unnecessarily bolster[ed]

---

[3] Hendershot's appellate brief also cites Texas Rule of Evidence 403, which states:  "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."  TEX. R. EVID. 403.  He has not preserved this particular complaint for appeal, however, because his trial counsel only objected to the evidence on the grounds of relevance.  *See Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009) ("A complaint will not be preserved if the legal basis of the complaint raised on appeal varies from the complaint made at trial.").

the original photograph lineup" and "was irrelevant to the issue of identification, since the girl[s] had identified [Hendershot] from the original six photograph lineup array."

The State contends that the evidence was relevant because it showed that T.K. and K.V. in fact picked only Hendershot out of twelve different photographs rather than just six. We agree. Hendershot appears to concede that the evidence was relevant by arguing on appeal that this evidence "unnecessarily bolster[ed]" the evidence that both victims identified Hendershot as one of their assailants, which was indisputably relevant.[4] We note also that the State has cited cases from other jurisdictions wherein courts have concluded that so-called "negative identification" evidence may be relevant when the veracity of a complainant's identification is at issue. *See People v. Tisdel*, 775 N.E.2d 921, 927 (Ill. 2002) (noting that "evidence that a witness viewed a lineup containing individuals similar in appearance to the defendant but did not identify anyone would be relevant to the identification process"); *People v. Wilder*, 712 N.E.2d 652, 654 (N.Y. 1999) ("[A]s a general proposition, negative identification evidence will be relevant in certain circumstances . . . . [W]hen the reliability of an eyewitness identification is at issue, negative identification evidence can tend to prove that the eyewitness possessed the ability to distinguish the particular features of the perpetrator."). We conclude that this particular evidence was relevant because it made the existence of a consequential fact—i.e., that the girls' identification of Hendershot was accurate—more probable than it would be without the evidence. *See* TEX. R. EVID. 401.

Hendershot's fourth issue is overruled.

**4.      Hernandez Statement**

---

[4] Again, Hendershot's trial counsel objected to this evidence only on the basis of relevance; therefore, to the extent that he argues on appeal that the evidence constituted improper "bolstering," he has not preserved that complaint. *See id.*

11

By his fifth issue, Hendershot contends that the trial court erred by admitting evidence of a statement made by Hernandez to his son about whether he had to abide by a subpoena issued for his presence at trial. Specifically, the prosecutor asked Stephen, Hernandez's son: "Did your father tell you that you didn't have to show up for a subpoena because we couldn't do anything[?]" The trial court overruled Hendershot's trial counsel's objection to the question. The witness replied: "Yes, ma'am, he did say that I didn't have to show up for the subpoena. . . . He did tell me nothing could be done to me . . . ." Hendershot argues that this evidence was irrelevant.

We disagree. Any conduct on the part of a person accused of a crime, subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged. *Cueva v. State*, 339 S.W.3d 839, 882 (Tex. App.—Corpus Christi 2011, pet. ref'd) (citing *Torres v. State*, 794 S.W.2d 596, 598 (Tex. App.—Austin 1990, no pet.)). An attempt to tamper with a witness, or any criminal act designed to reduce the likelihood of prosecution, is an example of evidence showing "consciousness of guilt." *See id.* (citing *Gonzalez v. State*, 117 S.W.3d 831, 842 (Tex. Crim. App. 2003); *Wilson v. State*, 7 S.W.3d 136, 141 (Tex. Crim. App. 1999); *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996) (en banc) (op. on reh'g); *see also* TEX. PENAL CODE ANN. § 36.05(a)(4) (West Supp. 2011) (defining the crime of tampering with a witness as, *inter alia*, "coerc[ing] a witness or prospective witness in an official proceeding . . . to absent himself from an official proceeding to which he has been legally summoned . . .").

Hendershot's fifth issue is overruled.

### 5. Blood Sample

12

By his sixth issue, Hendershot argues that the trial court improperly admitted evidence of a blood sample because the State did not establish the proper chain of custody.

The Texas Court of Criminal Appeals has stated that, "although the evidentiary rules do not specifically address proper chain of custody, they do state that identification for admissibility purposes is satisfied if the evidence is sufficient to support a finding that the matter in question is what its proponent claims." *Druery v. State*, 225 S.W.3d 491, 503 (Tex. Crim. App. 2007) (citing TEX. R. EVID. 901(a)). The court properly admits evidence when a reasonable juror could find that the evidence was authenticated. *Pondexter v. State*, 942 S.W.2d 577, 586 (Tex. Crim. App. 1996) (en banc). A chain of custody is sufficiently authenticated when the State proves the beginning and end of the chain; it need not show a "moment-by-moment account of the whereabouts of evidence from the instant it is seized." *Shaw v. State*, 329 S.W.3d 645, 654 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Reed v. State*, 158 S.W.3d 44, 52 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). Absent evidence of tampering, most questions concerning care and custody of a substance go to the weight attached to the evidence, not to its admissibility. *Id.* (citing *Lagrone v. State*, 942 S.W.2d 602, 617 (Tex. Crim. App. 1997)); *see Caddell v. State*, 123 S.W.3d 722, 727 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) ("Objections regarding theoretical or speculative breaches in the chain, without affirmative evidence of impropriety, go to the weight of the evidence rather than to its admissibility.").

Here, Ranger Garza testified that he obtained evidentiary search warrants to collect blood samples from Hernandez and Hendershot; that he observed a nurse extract blood from each of the men on February 25, 2009; that the nurse gave the

samples to him in glass vials; and that he sealed each sample in a bag and took them to the DPS crime laboratory in Corpus Christi. He stated that, when the lab completed its analysis, he picked the vials up from the lab and held it in his property locker which is locked at all times. Ranger Garza later testified that he recognized the vials marked as State's exhibits 20 and 21, and that those vials contained the blood that he watched being drawn from the two co-defendants.

Castro, the DPS forensic scientist, testified that the blood samples were properly sealed when she received them and that she did DNA analysis on those samples. She stated that, when the analysis was complete, she re-sealed the samples and initialed the vials.

Patrick Jennings, the nurse who drew the blood samples from both Hernandez and Hendershot, testified as to his standard procedure for collecting blood samples pursuant to a search warrant. He stated that he typically obtains a photo identification of the individual named in the warrant and writes the individual's name and date of birth on the vial into which the individual's blood will be drawn. When the draw is complete, he writes his own initials and the date of the draw on the vial, places it in a biohazard bag, and seals in it front of the patient and the attending officer. Jennings stated that, in the case of Hendershot's sample, he "cannot tell" if his initials are present on the vial because "[w]here I would put my initials there is a lot of writing from the lab. It covers everything." Jennings did state, however, that he recognized his own handwriting on other parts of the vial.

Hendershot contends that, "[b]ecause the [S]tate failed to establish that the nurse's initials were on the vials of blood, the chain of custody was broken." He does not, however, cite any legal authority, and we find none, establishing that such a failure

14

constitutes affirmative evidence of tampering or other impropriety. *See Caddell*, 123 S.W.3d at 727. Instead, as noted, the State is only required to establish the beginning and the end of the chain of custody in order to admit the evidence; any other questions concerning "care and custody" of the evidence goes only to the weight of the evidence. *See Shaw*, 329 S.W.3d at 654. Ranger Garza's testimony itself established the beginning and the end of the chain of custody with respect to Hendershot's blood sample. A reasonable juror could have concluded that the evidence was authenticated. *See Pondexter*, 942 S.W.2d at 586. Accordingly, Hendershot's fifth issue is overruled.

## C. Charge Error

Finally, Hendershot argues by his seventh issue that the trial court erroneously allowed the State's proposed definition of "reasonable doubt" to be included in the jury charge. The paragraph of the jury charge at issue stated:

> The prosecution has the burden of proving the Defendant guilt [sic] and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the Defendant. It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.

Hendershot's counsel objected to the last sentence in this paragraph, arguing that it improperly defined "reasonable doubt" for the jury. In reviewing an alleged jury charge error that has been preserved by objection at trial, as here, we first examine the charge to determine if there was error, and if we find error, we must reverse if we find that "some harm" has been done to the appellant's rights. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005) (en banc).

In 1991, the Texas Court of Criminal Appeals held for the first time that "reasonable doubt" must be defined in a criminal jury charge. *See Geesa v. State*, 820

15

S.W.2d 154, 162 (Tex. Crim. App. 1991). The Court explicitly overruled that holding in *Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000). In *Paulson*, the Court stated that "the better practice is to give no definition of reasonable doubt at all to the jury." *Id.* However, in *Woods v. State,* the Court concluded that the trial court's inclusion of a definition of "reasonable doubt" identical to the definition in the instant case was not an abuse of discretion. 152 S.W.3d 105, 115 (Tex. Crim. App. 2004). In *Mays v. State*, the Court again concluded that the inclusion of an instruction identical to the one in the instant case was not an abuse of discretion. 318 S.W.3d 368, 389 (Tex. Crim. App. 2010). Bound as we are to follow the precedent of the court of criminal appeals, *see Ervin v. State*, 331 S.W.3d 49, 53 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd), we likewise conclude that the jury charge in this case did not contain error.[5] We overrule Hendershot's seventh issue.

### III. CONCLUSION

Having overruled Hendershot's seven issues, we affirm the judgment of the trial court.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed the
9th day of August, 2012.

---

[5] The State argues that, even if the inclusion of the definition was error, Hendershot invited the error because his trial counsel suggested to the jury at voir dire and closing argument that "reasonable doubt" is "not clearly defined" and "for some people" may mean "all doubt." *See Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011) ("The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental."). We need not address this argument because we have found no jury charge error. *See* TEX. R. APP. P. 47.1.

16